**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Marktray SPEARMAN, Defendant–Appellant.**

No. 97–2339.

United States Court of Appeals, Sixth Circuit.

Argued April 30, 1999.

Decided Aug. 2, 1999.

Mark C. Jones (argued and briefed), Office of the U.S. Attorney, Flint, MI, for Plaintiff–Appellee.

Douglas R. Mullkoff (argued and briefed), Ann Arbor, MI, for Defendant–Appellant.

Before: RYAN, BATCHELDER, and CLAY, Circuit Judges.

CLAY, J., delivered the opinion of the court as to Parts I and III, and the result reached in Part II. RYAN (p. 756) and BATCHELDER (pp. 756–59), JJ., delivered separate opinions concurring in

the result reached in Parts I and III, and specifically refusing to concur in any aspect of Part II except subpart D.

## OPINION

CLAY, Circuit Judge.

Defendant, Marktray Spearman, appeals from his conviction for conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. For the reasons set forth below, we AFFIRM Defendant's conviction.

## BACKGROUND

### *Procedural History*

A grand jury issued a twelve count superseding indictment against Defendant (a/k/a "Punchie") and his brother, Edward Omar Spearman, on March 17, 1995, where Count 2, conspiracy to distribute cocaine, 21 U.S.C. §§ 841(a)(1), 846; Count 10, use of a firearm in relation to a felony drug offense, 18 U.S.C. § 924(c); and Count 11, use of firearm in relation to a drug felony offense, 18 U.S.C. 924(c), related to Defendant. Count 1 as well as Counts 3–9 related to Edward Spearman.[1] Prior to trial, Defendant filed a "motion for pretrial hearing to determine existence of conspiracy in order to determine if severance is appropriate," which the district court denied.

A jury trial was held from January 26, 1996 through February 29, 1996. At the end of trial, Defendant made a motion for judgment of acquittal. The district court denied the motion on Count 2, and took Counts 10 and 11 (those counts charging use of firearms in relation to a felony drug offense), under advisement. The jury rendered guilty verdicts on all three counts issued against Defendant; thereafter, the district court granted Defendant's motion

---

**1.** Defendant's brother, Edward O. Spearman, was tried in conjunction with Defendant during a joint jury trial. Edward was convicted of, among other things, two counts of drug related murder and participating in a continuing criminal enterprise, for which he was sentenced to three life terms' imprisonment. Edward appealed his conviction and sentence and this Court affirmed in an unpublished opinion. *See United States v. Spearman,* No. 96–1887, 1998 WL 840870 (6th Cir.1998).

for judgments of acquittal on Counts 10 and 11. Defendant was sentenced on the single remaining conviction—conspiracy to distribute cocaine—to a term of 355 months' imprisonment plus a five-year supervised release term. It is from this conviction and sentence that Defendant now appeals.

### Facts

This case arises out of an investigation into drug and firearm dealings in the City of Flint, Michigan. The investigation centered around Defendant, his brother Edward, Jerome Barfield, Laron Burns, as well as other actors and their roles in the distribution of crack cocaine. Barfield testified that he had known Defendant and Edward for about twenty years; that he began selling crack cocaine in 1987 for "double ups" (paying $50 for the cocaine and selling it for $100); that he sold crack cocaine to Defendant and Edward whenever their supply was depleted or running low; and that they did the same for him. Barfield stated that it was common for people who sold cocaine to buy back and forth from one another when their supplies ran low. From 1988 through 1991, Barfield sold cocaine on the same streets as Defendant and Edward. Barfield saw Defendant selling drugs on a daily basis, and he saw Edward with Defendant about three to four times a week.

Defendant and Edward were members of a gang called "Folks Up;" members of the gang wore distinctive clothing and colors; and the gang was involved in the sale and distribution of cocaine. Members of the gang specifically worked for Barfield in the sale and distribution of cocaine. If Defendant was "short" of money to purchase the cocaine, Barfield would loan him the money; and if Defendant and Barfield were both short on money, Edward would loan them the money to purchase the cocaine for resale. Whenever there was a shortage of cocaine in the area, Lonzo Keel would help supply cocaine to Barfield, Defendant, and Edward. Barfield, Defendant, and Edward discussed their displeasure with the Detroit-based drug dealers "setting up shop" in the Flint area because the Detroit dealers presented too much competition.

In February of 1992, Defendant accompanied Barfield and Barfield's two brothers on a trip to Miami for the purpose of purchasing cocaine. During the trip, Barfield discussed "drugs" with Defendant, particularly the kilogram of cocaine that the men were going to purchase in Florida. On the way back to Michigan, the men stopped in Philadelphia to purchase cocaine; however, the price was too high. Barfield explained that he and Defendant had each brought $12,500 on the trip for the purpose of purchasing cocaine and later selling it in Flint. Defendant and Barfield were going to combine their money ($25,000 in total), purchase the cocaine, and then split the cocaine down the middle for resale purposes. Defendant, Barfield, and the other men with whom they were traveling videotaped portions of the trip to and from Miami. When he returned to Flint, Defendant was ultimately arrested in the attic area of a house where he was known to reside. Cocaine was found in the attic at the time of Defendant's arrest.

At Defendant's trial, the prosecution admitted the entire videotape of Defendant's trip to Florida into evidence without objection, and played portions of the videotape to the jury. Defendant objected to the videotape being played in selected portions, arguing that the entire tape should be played so that the jury would interpret the tape in its proper context. The trial court overruled Defendant's objection; however, the court allowed Defendant the opportunity to play the tape in its entirety if he chose to do so, and also allowed the jury to view the tape in its entirety during their deliberations if they felt that it was necessary.

### ANALYSIS

#### I.

### Sufficiency of the Evidence

Defendant first argues that there was insufficient evidence presented by the

government to support his conviction for conspiracy to distribute cocaine beyond a reasonable doubt. Defendant contends that there was no evidence to indicate that he entered into a criminal agreement to distribute cocaine, and that the government's evidence merely indicated coincidental drug dealings and a family relationship between co-defendants. We disagree.

■ We review a challenge to the sufficiency of the evidence by considering the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *United States v. Jones,* 102 F.3d 804, 807–08 (6th Cir.1996). A defendant making such a challenge bears a very heavy burden. *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.1986). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Id.* (citing *United States v. Stone,* 748 F.2d 361 (6th Cir.1984)). Furthermore, it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court. *See Krulewitch v. United States,* 336 U.S. 440, 454, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *United States v. Sherlin,* 67 F.3d 1208, 1214 (6th Cir.1995).

When considering a challenge to the sufficiency of the evidence on a conviction for conspiracy to distribute drugs, this Court has found as follows:

> The essential elements of conspiracy are that the conspiracy was willfully formed and that the defendant willfully became a member of the conspiracy. An overt act need not be proven in a § 846 conspiracy. For conviction, [the defendant] must have been shown to have agreed to participate in what he knew to be a joint venture to achieve a common goal. However, actual agreement need not be proved. Drug distribution conspiracies are often "chain" conspiracies such that agreement can be inferred from the in-

terdependence of the enterprise. One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell.

*United States v. Bourjaily,* 781 F.2d 539, 544 (6th Cir.1986) (citations omitted).

■ As noted in *Bourjaily,* for conviction, actual agreement need not be proved in that the agreement may be inferred from the interdependence of the enterprise. 781 F.2d at 544. Here, pursuant to Barfield's testimony, a reasonable juror could clearly infer that Defendant entered into an agreement to distribute cocaine with Barfield and Edward beyond a reasonable doubt. For example, Barfield testified that if any one of the three were "short" on cash to purchase cocaine for distribution, they would loan one another money to make the purchase; that on one occasion Barfield heard Edward order Defendant to "cook-up" some crack cocaine in the microwave; that Barfield and Defendant "cooked-up" cocaine together for the purpose of selling it for profit; that Barfield and Defendant traveled to Florida and to other states for the purpose of purchasing cocaine for distribution in Flint, and that they were each going to contribute $12,500 to purchase the cocaine; that Defendant and Edward were members of the "Folks Up" gang, and that members of the gang sold cocaine for Barfield.

Accordingly, Defendant's argument that it was merely coincidental that Defendant, Edward, and the people with whom they were involved all sold drugs, is wholly without merit. The overwhelming testimony indicates that Defendant willfully participated with Edward and Barfield to achieve the common goal of distributing cocaine inasmuch as the agreement to do so could be inferred from the interdependence of their acts, and where the evidence indicated that on at least one occasion a kilogram of cocaine was involved. *See*

*Bourjaily,* 781 F.2d at 544–45 (finding that the involvement of a large volume of narcotics, such as kilogram, creates an inference of conspiracy).

## II.

### Challenge to the Jury Selection Process

Defendant next argues that his indictment should be dismissed on the basis that the jury selection process by which his jury was selected has been found to be unconstitutional. Specifically, Defendant contends that under *United States v. Ovalle,* 136 F.3d 1092, 1108–09 (6th Cir. 1998), wherein this Court found that the Section VIII.B. of the jury selection process in the Eastern District of Michigan violated the equal protection rights guaranteed to individuals under Fifth Amendment, and violated the Jury Selection and Service Act, 28 U.S.C. §§ 1861 *et seq.,* his indictment should be dismissed.

### A. The Jury Selection Process in the Eastern District of Michigan

On February 3, 1992, the judges of the United States District Court for the Eastern District of Michigan approved a Jury Selection Plan, the purpose of which was to "select grand and petit juries at random from a fair cross section of the community, and to assure that all citizens would have the opportunity to be considered for service on these juries." *See Ovalle,* 136 F.3d at 1095 (citing 92–AO–035). The plan was subsequently approved by the Judicial Council of the United States Court of Appeals for the Sixth Circuit on April 1, 1992. *Id.* Subsequently, several administrative orders were issued to implement the plan, including the administrative order at issue in *Ovalle,* 92–AO–080, filed on November 17, 1992, which was enacted to correct the underrepresentation of African Americans in the jury array, and provided in pertinent part as follows:

IT APPEARING THAT the Black population, as reported in the 1990 census for the 21 counties for which the place of holding is Bay City, is 4.2%, and

IT FURTHER APPEARING THAT, as of November 4, 1992, the percentage of qualified Black jurors in the Bay City wheel created in 1992 is 3.45%,

NOW, THEREFORE, IT IS ORDERED THAT, based on the information on the attached "Worksheet for the Removal of Jurors from the Qualified Bay City Jury Wheel," the Clerk of the court shall remove by a random process the names of 877 White and Other Qualified Jurors from the 4,829 total qualified jurors in the 1992 wheel to bring it into compliance with the cognizable group requirements of Section VIII. B. of the Jury Selection Plan, approved on April 1, 1992, and the policy of the Court. As a result of this procedure, the 1992 qualified Bay City wheel shall be composed of 166 Black qualified jurors and 3,786 White and Other qualified jurors. A quotient of 5 and a starting number of 4 shall be used for the removal procedure.

*Id.* at 1096 (citing 92–AO–080). However, once *Ovalle* invalidated Section VIII. B. (including the above administrative order), the Eastern District of Michigan simply struck that section from the jury selection plan leaving the remainder of the plan in effect, *see* 98–AO–011. In other words, despite knowledge that the jury selection plan before the advent of Section VIII. B. was infirm as applied to African Americans, the *Ovalle* court provided no guidance to the Eastern District of Michigan after it struck Section VIII. B. as to how the district should correct this infirmity, and the Eastern District has not taken it upon itself to do so. Rather, the Eastern District simply did as instructed: it struck Section VIII. B. from the plan, leaving the remainder of the plan *status quo ante* and African Americans in the same underrepresented position.

Significantly, the apparent inequity resulting from *Ovalle* as applied to jury impanelment in that district has been authoritatively described as follows:

The Eastern District of Michigan now selects juries under an amended plan calling for random selection. The court now has "clean" grand juries and "clean" panels. Early experiences suggest that judges are trying criminal cases largely with African–American defendants, prosecuted in front of mostly white judges, by mostly white prosecutors and defense counsel, and with decisions made by almost all-white juries. This is not fairness in the criminal justice system.

Avern Cohn & David R. Sherwood, *The Rise and Fall of Affirmative Action in Jury Selection*, 32 U. Mich. J.L. Reform 323, 333 (1999).[2]

Because of the failure of the district judges in the Eastern District of Michigan to address the above-referenced problems created by the *Ovalle* decision, it would seem that the district judges failed in their responsibility to devise a jury selection plan which provides for a fair cross section of the community as applied to all races; instead, they simply did as *Ovalle* instructed: they redacted Section VIII. B. from the plan, thereby leaving a process in place which had been known to result in the inadequate representation of at least one minority group—African Americans.

## B. Preservation of Defendant's Claim and *Ovalle's* Limitations

Defendant preserved his challenge to the underrepresentation of African Americans in the composition of the jury venire by making a timely objection in the district court. Defendant rested his objection on his brother Edward's objection, which was made through counsel and stated as follows:

Prior to beginning jury selection this morning we met in chambers and I brought my concerns to the Court's at-

tention regarding the composition of the jury pool. As it turns out, we had four black jurors among all the jurors that we talked to today. And I indicated to the Court that I had a problem with the composition of the jury pool.

And I was told I would be given the opportunity to put that on the record. And so I'm just taking this opportunity now before we leave for the day to put that on the record.

Based upon this statement, it is apparent that defense counsel raised an objection to the composition of the jury venire prior to jury selection, albeit in the judge's chambers, in compliance within the mandates of Fed.R.Crim.P. 12(b)(2). Accordingly, Defendant's challenge under *Ovalle* is not lost due to timeliness. *See United States v. Spearman*, No. 96–1887, 1998 WL 840870, at *10 (6th Cir.1998).

However, because Defendant based his objection to the jury array on the grounds that African Americans were not adequately represented, he failed to preserve his challenge made under *Ovalle*. That is to say, because *Ovalle* limits "challenges to the composition of the jury array to instances where a jury selection plan allegedly deprives non-blacks of their right to jury service by exempting non-blacks from the jury wheel in order to increase the number of black jurors," Defendant failed to raise an *Ovalle* challenge here. *See United States v. Spearman*, 1998 WL 840870, at *10 (citing *Ovalle*, 136 F.3d at 1106–07). That is *not* to say that Defendant was precluded from challenging the composition of the jury array on appeal on the basis that African Americans were not adequately represented. Simply because the Eastern District of Michigan had a process in place which attempted to increase the number of African Americans on the jury array in no way means that the

---

**2.** This article was authored by Avern Cohn, United States District Judge for the Eastern District of Michigan, and David A. Sherwood, the former Chief of Court Operations for the Eastern District of Michigan. Both authors,

by virtue of their respective positions, were involved in and knowledgeable about the efforts made to devise a jury selection plan for that district.

process was effectual. However, Defendant would have had to raise an independent challenge under the Sixth Amendment right to a jury representing a fair cross section of the community, not under *Ovalle,* inasmuch as *Ovalle* addresses the constitutionality of Section VIII. B. as applied to *"non-blacks,"* and fails to address the issue of adequate representation of blacks, or other minorities as well. *See Ovalle,* 136 F.3d at 1100, 1106 (stating that "[w]e believe, however, that the proper focus is on whether non-African-Americans were eliminated from the qualified jury wheel based solely on their racial status," and not on the underrepresentation of any group).

Moreover, to argue that *Ovalle* does not limit challenges to the jury venire to non-blacks as the concurrence suggests, is simply a distinction without a difference inasmuch as the African–American defendant who bases his challenge to the jury array under *Ovalle* is effectively left without any relief.[3] Again, this is because *Ovalle* only addresses the issue of when relief should be afforded to "non-black" defendants whose constitutional rights have been violated by the exclusion of non-blacks from the jury array, and expressly states that the non-black defendants were prejudiced by the plan's attempt to increase the number of black jurors. *See Ovalle,* 136 F.3d at 1106 (finding that "[t]he [jury selection] plan does not even attempt to assure that Hispanics or any other cognizable group except for African–Americans are appropriately represented on the jury wheel"). In other words, whether the court refuses to consider the African–American defendant's challenge to the jury venire brought under *Ovalle* as unpreserved because it was raised on the wrong grounds, or whether the court considers the African–American defendant's challenge as allowed under *Ovalle* and addresses the merits of

the defendant's claim, the result is the same—the African–American defendant is afforded no relief. *See, e.g., United States v. Carr,* No. 97–1367, 97–1422, 97–1513, 97–1584, 97–1814, 1999 WL 211928, at *6 (6th Cir. Mar.11, 1999) (Appendix to Published Opinion) (finding it unlikely that the black defendant raising a challenge under *Ovalle* could establish prejudice from his counsel's failure to raise an objection to the jury venire in the district court, because "the jury selection plan criticized in *Ovalle* excluded non-blacks from juries. Snyder [defendant] is black. It is difficult to imagine how the exclusion of non-blacks from juries ... could cause him prejudice").

Therein lies the problem inherent in the *Ovalle* decision; in finding that the jury selection process in the Eastern District of Michigan was constitutionally infirm, the court limited its analysis to the "mechanics" of Section VIII. B., while failing to consider the purpose behind the enactment of that section—to correct the underrepresentation of African Americans in the jury array which had been demonstrated to exist in that district, and while failing to recognize that its decision fell short of guaranteeing that the jury selection process left in the Eastern District of Michigan provided for a fair cross section of the community under the Sixth Amendment.

In her concurrence, Judge Batchelder criticizes this interpretation of *Ovalle,* calling it "indefensible" because, among other reasons, the *Ovalle* court had before it "a timely claim supported by direct evidence in the record that the jury selection plan required the exclusion of some Hispanics from jury service solely because of their race.... Because the issue was not before us, we did not address the issue of whether the jury selection plan was unconstitutional in any other respect." i.e., the

---

**3.** As will be discussed *infra* in this section, had the *Ovalle* court examined the issue of whether the plan at issue was constitutional as applied to African Americans, Defendant may have been afforded relief under *Ovalle*

rather than being caught in the circular maze suggested by the concurrence where Defendant is allowed to raise a claim for which no relief is available.

*Ovalle* court did not have the issue of fair representation before it. However, one need look no further than the *Ovalle* opinion itself to see that the concurrence is misguided in its criticisms. Specifically, the *Ovalle* court stated as follows regarding the district court's decision and the scope of this court's review:

The district court held that the appellants had not carried their *prima facie* burden on any of their jury selection claims because they failed to show that Hispanics were significantly underrepresented. The district court rejected the appellants' claims under the *Sixth Amendment and the Fifth Amendment* because the district court focused only on the issue of whether Hispanics were underrepresented. The district court's jury administrator did not have complete records on the Hispanic status of the qualified jury wheel. The appellants had filed a motion prior to the district court's determination of the jury selection issues requesting the opportunity to review the juror cards in a manner that would allow them to contact some of the more than 2,900 juror candidates who had not answered the Hispanic-status question on the questionnaire.

The district judge restricted the appellants' inspection of the list of qualified juror candidates by allowing a limited inspection of the 3952 questionnaires that remained in the jury wheel and prohibiting the appellants from contacting any of the individuals. This order prevented the appellants from ascertaining the degree of Hispanic representation in the jury wheel relative to the percentage of Hispanics in the community. This decision was particularly important to the appellants because a showing of underrepresentation is necessary to establish a prima facie case of the Sixth Amendment's fair cross-section requirement. *Because we believe that our analysis of the JSSA and Fifth Amendment claims discussed below adequately resolves the issues in this case, we make no ruling on the district*

*court's decision regarding either the appellants' access to the Hispanic-status information or the district court's determination of the Sixth Amendment underrepresentation issue.*

*Ovalle,* 136 F.3d at 1097–98 (citations and footnotes omitted; emphasis added). As can be seen by the above quoted language, and contrary to the concurrence's contention, the Sixth Amendment underrepresentation issue *was* before the *Ovalle* court; the *Ovalle* court simply misguidedly believed that the decision was "adequate" without addressing the Sixth Amendment issue. *See id.* By its very words the *Ovalle* court admits that it limited its analysis to the issues of the JSSA and Fifth Amendment challenges, while declining to review the Sixth Amendment challenge of underrepresentation. As this opinion makes clear, it was the *Ovalle* court's failure to consider the Sixth Amendment challenge which leaves it lacking. Even assuming the correctness of the court's conclusion on the JSSA and Fifth Amendment issue, this assumption does nothing to correct the inequity left by the *Ovalle* decision's failure to consider the issue of fair representation under the Sixth Amendment. As noted in the discussion which follows, just as the *Ovalle* court extended its jurisdiction to adjudicate the rights of groups not before it when considering the Fifth Amendment challenge, the court should have invoked its equitable jurisdiction, if by nothing more than via an order to the district court, to adjudicate the rights of all groups to insure adequate and fair representation under the Sixth Amendment.

Indeed, at issue in *Ovalle* was whether Hispanics were unconstitutionally represented in the jury array in violation of the appellants' Sixth Amendment right to a jury drawn from a fair cross section of the community, as well as their equal protection rights under the Fifth Amendment. *Ovalle,* 136 F.3d at 1095. However, the *Ovalle* court chose not to adjudicate the issue of fair representation, and instead

limited its analysis and holding to the equal protection claim as applied to the "mechanics" of Section VIII. B. *Id.* at 1095, 1106 (finding that underrepresentation of any group "was not the point" of the court's inquiry) In stopping short of properly adjudicating the constitutionality of the jury selection process in the Eastern District, the court further frustrated the problem of unfair representation in the jury venire by dividing its analysis into two broad categories of potential jurors—blacks and "non-blacks." The court erroneously assumed that in extending its jurisdiction beyond the Hispanic defendants before it, it was properly adjudicating the rights of what the court termed "non-African-Americans," including whites, Asians, and American Indians. However, by dividing the group of potential jurors into two broad categories of blacks and "non-blacks," in only adjudicating the rights of the "non-blacks," and in failing to consider actual representation of the individual groups, the court singled out African Americans as somehow being adequately—or more than adequately—represented by the jury selection plan that was in place at the time when, historically, it had been the white population which had been more than adequately represented.

Furthermore, by failing to address whether all groups were constitutionally represented, the court also left unredressed the issue of whether the jury selection plan which was in place at the time, although designed to increase the number of African Americans in the jury array, was in fact providing for a representative number of black jurors. To add insult to this injury, the *Ovalle* decision is being interpreted as holding that the plan which it found to be constitutionally infirm as applied to what the court termed "non-blacks," was constitutionally sound as applied to blacks, *see Carr,* 1999 WL 211928, at *6, without any statistics or empirical data being examined upon which to base this interpretation.

In addition, the court erroneously assumed that by invalidating Section VIII. B. of the plan, it thereby remedied the constitutionally infirm jury selection process that existed in the Eastern District of Michigan. However, by failing to consider the adequate representation of citizens in the jury array in the Eastern District in the course of its analysis, the *Ovalle* court did not recognize that while it may have been invalidating a jury selection process which was constitutionally infirm as applied to "non-blacks," it was leaving in its wake a jury selection plan which was unconstitutional as applied to blacks—and possibly other minority groups as well—inasmuch as the *Ovalle* court simply invalidated Section VIII. B. of the plan. By hastily ending its analysis there, the *Ovalle* court left African Americans in the same "underrepresented" position as they were before the plan was initiated, thereby simply exchanging one apparently unfair process for another, without considering the impact of its ruling on the underrepresentation of blacks in the jury selection process—a problem that had been duly recognized by the United States District Court for the Eastern District of Michigan, and without examining through statistics or empirical data whether the plan left *status quo ante* was constitutionally sound as applied to *all* minority groups. Simply put, the *Ovalle* court, however unintentionally, failed to properly insure that the jury selection process remaining in the Eastern District of Michigan following *Ovalle* was constitutional as applied to *all* races, inasmuch as it failed to consider the issue of adequate representation which is precisely "the point" of a constitutionally sound jury selection plan. *See Ovalle,* 136 F.3d at 1106. It is therefore not so much what *Ovalle* says, but what it does not say, which has led to untoward consequences for minorities who most need the court's protection to guarantee their constitutional right to a jury trial under the Sixth Amendment.

## C. The *Ovalle* Court's Equitable Jurisdiction to Insure Proper Resolution of the Case

The *Ovalle* court had before it the constitutionality of the jury selection plan in the Eastern District of Michigan as applied to the Hispanic defendants at issue; however, the court extended its jurisdiction to what the court called "non-African-Americans," finding that the Hispanic defendants had standing to assert the constitutional rights of these other groups. *Ovalle*, 136 F.3d at 1102–04. The pitfall of this two-prong categorical inquiry was that the court's truncated analysis inherently favored white individuals who had already been shown to disproportionately dominate the jury array in the district. That is to say, because the *Ovalle* court failed to follow through in its adjudication of the jury selection process by considering the issue of adequate representation in the jury array, the court's decision had the paradoxical effect of potentially increasing the number of white jurors, a group which had been shown to be overrepresented, while decreasing the number of African Americans, a group which had been known to be underrepresented, and while failing to insure the Sixth Amendment rights of all minority groups.

The *Ovalle* court had no empirical data before it to suggest that the plan, although intended to fairly represent African Americans in the jury array, was in fact doing so.[4] Furthermore, the *Ovalle* court was well-aware of the fact that the jury selection process at issue in the Eastern District of Michigan was instituted in an attempt to increase the number of African Americans on the jury array inasmuch as this minority group was historically underrepresented on federal juries in the district. *See Ovalle*, 136 F.3d at 1095 (noting that the jury selection plan at issue was designed "in an effort to assure that African–Americans are fairly represented in the qualified jury wheel"). Thus, it was improvident for the *Ovalle* court to limit its analysis and "remedial" holding to "non-blacks" and the constitutionality of Section VIII. B. Rather, the *Ovalle* court should have invoked its equitable jurisdiction and considered whether the application of Section VIII. B. provided for a fair representation of blacks, as it had similarly done in extending its jurisdiction to "non-blacks;" it should have considered the continuing constitutional violation left in the wake of its decision; and it should have remanded the case with instructions to the Eastern District of Michigan to devise a jury selection process that is constitutional as applied to *all* races and ethnic groups, while retaining jurisdiction to insure that the Eastern District so complied.[5] *See Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (equitable jurisdiction allowed to remedy ongoing constitutional violations in the administration of state prisons); *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (equitable power exercised by federal court relating to educational components of desegregation); *White v. Weiser*, 412 U.S. 783, 795–95, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) (equitable jurisdiction in voting

---

**4.** Arguably, jury selection plan which included Section VIII. B. may not have been adequately representing African Americans in the jury array inasmuch as Defendant, whose jury was being selected under that plan, raised an objection to the jury venire on the grounds that African Americans were not fairly represented, in that only four potential jurors in his jury pool were black.

**5.** Notably, the *Ovalle* court suggested that the Eastern District of Michigan could have corrected the underrepresentation of African Americans in the jury array, and provided for a jury pool that represents a fair cross section of the community "without unconstitutionally discriminating against individuals by eliminating them from the jury wheel simply on the basis of their racial status." *See Ovalle*, 136 F.3d at 1106. Unfortunately, the court provided no directive to the Eastern District of Michigan to invoke any of these measures, and it did not retain jurisdiction to insure that any such measures would be taken by the Eastern District to correct the underrepresentation of African Americans, and perhaps other minorities as well, in the jury array.

rights case); *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (equitable jurisdiction in school desegregation case); *United States v. Montgomery County Bd. of Educ.*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) (same); *United States v. Yonkers Bd. of Ed.*, 837 F.2d 1181 (2d Cir.1987) (equitable jurisdiction in housing desegregation case).

The equitable jurisdiction afforded to a federal court is broad enough to have allowed the *Ovalle* court to have considered the plan at issue as applied to blacks under the Sixth Amendment right to a fair cross section of the community, as well as to have remanded the case with instructions to remedy the constitutionally infirm jury selection process which was left in place by virtue of the court's decision. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (finding that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"). As recently noted by this court in *Associated Gen. Contractors of Am. v. City of Columbus*, 172 F.3d 411, 417 (6th Cir. 1999), "[t]he use of equitable power ... has been confined to those circumstances in which the court has found that the state or local governmental entity has violated the Constitution, and that the mere cessation of the particular activity or method of operation will not serve to remedy the violation."

In *Ovalle*, the mere cessation of the jury selection process in existence at the time the case was decided did not serve to remedy the continuing constitutional infirmity of the jury selection process in the Eastern District of Michigan. The *Ovalle* decision simply shifted the focus of the unfairness from potential non-black jurors to potential black jurors, in that there remained a jury selection process after *Ovalle* which offended the Constitution as applied to blacks (and possibly to other minorities as well); hence, there remained a continuing wrong which the *Ovalle* court should have recognized and addressed thorough its equitable power.[6] Because the Ovalle court stopped short of properly adjudicating the constitutionality of the jury selection process in the Eastern District of Michigan as applied to *all* races and ethnic groups, *Ovalle* is "ill-advised in its reasoning or unduly circumscribed by its own terms in its application." *See Spearman*, 1998 WL 840870, at *10.

As recently articulated by Justice Sandra Day O'Connor in a speech delivered to The National Conference on Public Trust and Confidence in the Justice System, "there is a rather widespread belief that African Americans are not treated as fairly as other groups [in our court system, and] ... concrete action must be taken to insure that court services do not operate in ways that perpetuate racial or gender bias.... The justice system must provide for the fair, prompt, and proper resolution of the conflicts brought to it...." Luncheon Address of Justice Sandra Day O'Connor, Associate Justice, Supreme Court of the United States, to National Conference on Public Trust and Confidence in the Justice System, at 4, 5, 11 (May 19, 1999). In accordance with the thinking expressed by Justice O'Connor, it

---

**6.** Although there were no problems of justiciability to prevent the *Ovalle* court from passing on the constitutionality of the jury selection process at issue as applied to African Americans, or the process remaining after its decision, *see Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), even if a problem of justiciability did exist, at the very least the *Ovalle* court should have recognized the impact of its decision on African Americans, and urged the judges of the Eastern District of Michigan to devise a selection process that was constitutionally sound as applied to all races and ethnic groups. Although mindful of the fact that African Americans had been underrepresented by the jury selection plan that had previously been in place, the *Ovalle* court failed to recognize this inequity and left the African–American population disadvantaged. As such, *Ovalle's* reasoning and application fall short. *See Spearman*, 1998 WL 840870, at *10.

was incumbent upon the *Ovalle* court to exercise its equitable power to provide "fair, prompt, and proper resolution" of the jury selection crisis in the Eastern District of Michigan to insure equality to *all* races and ethnic groups by considering the issue of adequate representation. This is particularly so in light of the fact that the *Ovalle* court had before it the one of the most precious guarantees of our criminal justice system—the right to a trial by one's peers. As Justice O'Connor emphasized, "[o]ur federal Constitution and all of its state counterparts guarantee the right to trial by jury. It is fundamental to our system of justice." *Id.* at 6.

Likewise, it is the fundamental nature of the jury process which makes *Ovalle* "ill-advised in its reasoning or unduly circumscribed . . . in its application," because although the *Ovalle* court makes sweeping pronouncements in its analysis regarding the sanctity of a race neutral jury, it limits its holding to those "non-black" defendants who raised a specific challenge to the underrepresentation of non-blacks in the jury selection process or to those "non-black" defendants who could show cause for and prejudice from the procedural default of having failed to raise the issue of the underrepresentation of "non-blacks." *See, e.g., Ovalle,* 136 F.3d at 1102, 1109 (noting that race discrimination in the selection of a jury casts doubt upon the integrity of the judicial process, and holding that any defendant who failed to object to the jury venire prior to trial was barred from raising such a claim on appeal). Such an outcome is unpalatable, and perhaps even unfair to the defendants who failed to make timely *Ovalle* challenges, when one considers the breadth with which the *Ovalle* court considers the right to a constitutionally sound jury, and when one considers that a defense attorney would have had no reason to challenge the jury selection process that was in place in the Eastern District of Michigan prior to *Ovalle,* inasmuch as the court to which he would make his challenge consisted of the very judges who approved the jury selection plan. *See id.* at 1095 (noting that on February 3, 1992, the United States District Court for the Eastern District of Michigan approved the jury selection plan at issue, and that the Judicial Council of the United States Court of Appeals for the Sixth Circuit subsequently gave its approval of the plan on April 1, 1992).

True enough, the African–American defendant selecting a jury in the Eastern District of Michigan today could raise a challenge to the jury selection process currently in place due to *Ovalle's* invalidation of the plan that was designed to insure fair and adequate black representation on the jury array. However, because the *Ovalle* court had notice of the fact that African Americans were not fairly represented in the Eastern District of Michigan, it appears that the jurisprudentially—if not constitutionally—sound approach would have been for the *Ovalle* court to have addressed the issue of fair representation by invoking its equitable jurisdiction, recognizing that it was leaving a jury selection plan in place that had been shown to be constitutionally infirm, and by ordering the judges of the Eastern District of Michigan to develop a jury selection process to provide for the fair representation of all citizens residing in the district, while retaining jurisdiction to assure that the judges so complied. In the absence of such instruction from the court of appeals, the judges of the Eastern District have unfortunately failed in their responsibility to devise such a plan.[7]

---

7. A brief note may be helpful regarding the assertion in Judge Batchelder's concurrence that it would have been beyond the power of the *Ovalle* court to invoke equitable jurisdiction in this case because, according to the concurring opinion, "in a criminal appeal, [the Court's jurisdiction] is limited to review of the final decision of the district court." Indeed, the concurrence's assertion is more than surprising considering the fact that the *Ovalle* court itself went well-beyond the final decision of the district court in adjudicating that case. *See Ovalle,* 136 F.3d at 1097–98; *see also* discussion *infra* Part II.B.

## D. Conclusion

 Although Defendant raised a timely objection to the composition of the jury array, his claim is nonetheless unpreserved for our review under *Ovalle* inasmuch as Defendant based his objection on the grounds that blacks were underrepresented, not on the grounds that Section VIII. B. was constitutionally infirm as provided for by *Ovalle*. It should be emphasized that this Defendant's challenge on appeal to the jury pool utilized in his case was specifically made pursuant to *Ovalle,* not pursuant to any other legal authority which might have supported his challenge, and it is for this reason that his claim is unpreserved for our review.[8]

## III.

### *Admission of Video Tape*

 Finally, Defendant argues that the trial court abused its discretion in allowing the government to play only portions of the videotape of Defendant's trip to Florida with Barfield and Barfield's brothers, during its case-in-chief. Defendant claims that, pursuant to Fed.R.Evid. 106, the trial court should have sustained Defendant's objection that the government not be allowed to play only portions of the tape, and instead have ruled that the government must play the tape in its entirety.[9] Defendant contends that he was prejudiced when the government played only portions of the tape inasmuch as he be-

lieves the jury took the portions out of context.

In *United States v. Branham,* this Court rejected an analogous argument made by the defendants regarding the government's use of audiotape recordings of conversations held between one of the defendants, a government informant, and an undercover police detective. 97 F.3d 835, 850 (6th Cir.1996). Prior to trial, the defendants moved to compel the government to play all of the audiotapes involving these men. *Id.* The trial court denied the defendants' motion, but specifically granted the defendants the opportunity to introduce and play any and all taped conversations not played by the government. *Id.* The defendants argued that, under Fed.R.Evid. 106, the trial court abused its discretion in denying their pretrial motion to play all of the audiotapes in chronological order during the government's case-in-chief. *Id.* The defendants claimed that "the playing of all tape recorded conversations in a sequential and chronological order was necessary to present a fair and impartial understanding of their respective roles in the attempted drug transaction." *Id.* This Court rejected the defendants' argument and found as follows:

> In this instance, the defendants had the opportunity to introduce the remaining tape recordings during the presentation of their evidence. Although they chose not to take advantage of that opportunity, the defendants could have developed the record to indicate the mag-

8. The concurrence by Judge Ryan suggests that taxpayers' money is being wasted by the publication of the short-comings of the *Ovalle* decision in this opinion. To the contrary, failing to thoroughly address the deprivation of a constitutional right in a case such as this, particularly a right as precious as the right to a jury trial by a fair cross section of the community, would be a dereliction of our judicial duty to the taxpayers. Quite frankly, it is hard to imagine a more worthy use of taxpayers' money than in the protection of the vital constitutional rights guaranteed to every citizen of this country. The fact that *Ovalle* is the law of this circuit does not mean that it was correctly decided; it certainly does not

mean that it is immune to criticism. Because Defendant in this case based his challenge to the jury selection process on *Ovalle,* we as judges have a judicial obligation to thoroughly address Defendant's challenge.

9. Federal Rule of Evidence 106 states:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

nitude of their roles in the transaction or to demonstrate an entrapment defense. Any prejudicial effect by the court's exclusion was neutralized by this fact. Accordingly, we cannot conclude that the district court abused its discretion in denying defendants' motion.

*Id.*

Likewise, in the instant case, the trial court provided Defendant the opportunity to play the videotape in its entirety. In fact, the record indicates that after the government completed its direct examination, counsel for Defendant began playing the entire tape, but stopped the tape before its completion, stating that Defendant simply wanted to give the jury the "flavor" of the tape. Therefore, as in *Branham,* any prejudicial effect caused by the court's exclusion was neutralized by the fact that the court provided Defendant the opportunity to play the tape in its entirety, and, as such, this Court cannot conclude that the trial court abused its discretion in allowing the government to play only portions of the videotape. *See* 97 F.3d at 850.

## CONCLUSION

For the above stated reasons, we **AFFIRM** Defendant's conviction.

RYAN, Circuit Judge, concurring.

Although I concur in Judge Clay's resolution of the issues properly before us in this appeal, as discussed in Parts I, II–D, and III of his opinion, I cannot sign his lengthy opinion because most of it addresses a matter that is not before us.

All of Part II of my brother's opinion, save the final paragraph, is a gratuitous and inappropriate attack upon a prior decision of this court, *United States v. Ovalle,* 136 F.3d 1092 (6th Cir.1998), the merits of which have nothing to do with the issues before us. Judge Clay's polemic, and his

criticism of the federal judges of the Eastern District of Michigan, might have a proper place in some academic journal, or Op–Ed page, or perhaps as subject matter for discussion at a bench/bar conference such as the annual Judicial Conference of the Sixth Circuit, but it is totally out of place in an opinion deciding this case.

In my judgment, my brother's criticism of *Ovalle* is an embarrassing imposition upon this court, not because of Judge Clay's personal views about the *Ovalle* decision—he is entitled to them—but because of the place he has chosen to express them. The taxpayers and the tens of thousands of lawyers who must pay for our ever-lengthening published opinions should not be required to subsidize my brother's essay attacking a precedently binding decision of this court whose issues and decisional rule have nothing to do with the case before us.

BATCHELDER, Circuit Judge, concurring.

I concur in the result reached in this case, although I do not agree with the lead opinion's reason for concluding that we cannot entertain Spearman's challenge to the jury selection plan. I would not write separately, however, were that my only disagreement with the lead opinion. I write separately because I take strong exception to my colleague's essay lambasting this court's opinion in *United States v. Ovalle,* 136 F.3d 1092 (6th Cir.1998). The lead opinion's exercise in polemics is not only unseemly—*Ovalle* is, after all, the law of this circuit, and the full court declined to grant a request to rehear the case en banc; the lead opinion's philippic is substantively incorrect as a matter of law and has virtually nothing to do with the case before us.

First, our decision in *Ovalle* is not relevant to the case before us here because, as the record demonstrates,[1] Marktray

---

1. On the morning that jury selection began for the trial of Marktray Spearman and his brother and co-defendant, Edward O. Spearman, Edward Spearman's counsel apparently

expressed to the trial judge some unrecorded "concern" about his belief that there were very few African–Americans in the jury pool. After the jury selection was completed, Ed-

Spearman never raised before the trial court any challenge—under *Ovalle* or on any other ground—to the jury selection plan. The sum total of Marktray Spearman's trial court action with regard to the jury array was to join in "remarks" made by his co-defendant's counsel after the jury had been selected, indicating "concerns" and "a problem" with the fact that the jury array from which the petit jury had just been chosen contained only four black jurors. Trial courts do not rule on "concerns" or "problems." Trial courts rule on motions and objections. Having neither made any motion nor raised any specific objection to the jury plan or the array, Spearman simply did not raise any cognizable challenge of any kind to the jury selection plan prior to his trial.[2]

Because the lead opinion's discussion of *Ovalle* is entirely irrelevant to the case before us, I would not ordinarily be drawn into a discussion of it; *Ovalle* is a closed book. But, because my colleague's denunciation of *Ovalle* is so seriously and substantively incorrect, I cannot leave unremarked his unwarranted attack on the *Ovalle* panel's decision. First, the lead opinion denounces the *Ovalle* panel for holding that the jury selection plan for the Eastern District of Michigan substantially violated the JSSA and was unconstitutional because it excluded non-African Americans from the jury wheel solely on the basis of their race. Because *Ovalle* does not address the issue of adequate representation of African Americans on the jury array, the lead opinion contends, it limits challenges to the jury selection plan to those brought by non-African Americans, effectively precludes African Americans from making any challenge to the constitutionality of that jury selection plan, and leaves African American defendants without any relief.[3]

---

ward Spearman's counsel stated on the record,

> Prior to beginning jury selection this morning we met in chambers and I brought my concerns to the Court's attention regarding the composition of the jury pool. As it turns out, we had four black jurors among all the jurors that we talked to today. And I indicated to the Court that I had a problem with the composition of the jury pool.
>
> And I was told I would be given the opportunity to put that on the record. And so I'm just taking this opportunity now before we leave for the day to put that on the record.

Marktray Spearman's counsel then said, "I have nothing to say, other than I join in counsel's remarks, Your Honor." Counsel for the Government opined, in response, that within the past couple of years, jurors had been pulled from drivers' license lists as well as from voter registration lists, which prior to that time had been the sole source of names for the jury pool. Government counsel then stated,

> But since counsel has raised it, the reason I'm bringing it up is that if there was in general a challenge to the panel that was intended, then I would argue that this is tardy, if you will. That's something that could have been done at an earlier point in time.
>
> It's difficult for me to simply—to respond to such a generalization without knowing what the supposed authority is and exactly what the legal theory is, Your Honor.

**2.** In *Ovalle*, we permitted the defendants Ovalle to raise their challenge to the jury selection plan for the first time on appeal, but only because their co-defendants had, in the same proceedings, timely challenged the plan. We expressly stated:

> We emphasize that it is only because the Ovalles' codefendants Canales and Garcia raised a timely objection to the seating of the grand and petit juries that the Ovalles are permitted the benefit of this decision. Had Canales and Garcia not raised these objections prior to trial, all of the appellants would be barred from raising such an objection for the first time on appeal or in a collateral proceeding attacking their convictions since the objection would be waived by the failure to object prior to trial. *See* Fed.R.Crim.P. 12(b)(2).

*Ovalle*, 136 F.3d at 1109.

**3.** The lead opinion goes so far as to make the statement, citing to our unpublished opinion in *United States v. Carr*, 1999 WL 211928 (6th Cir.1999), "To add insult to this injury, the *Ovalle* decision is being interpreted as holding that the plan which it found to be constitutionally infirm as applied to what the court termed 'non-blacks,' was constitutionally sound as applied to blacks, without any empirical data being examined upon which to base this interpretation." *Carr* did no such thing. *Carr* held that because the defendant had failed to raise a timely challenge to the

In my view the lead opinion's reading of *Ovalle* is indefensible. Before the court in *Ovalle* was a timely claim supported by direct evidence in the record that the jury selection plan required the exclusion of some Hispanics from jury service solely because of their race. We held that a defendant who timely challenges a jury selection plan under the JSSA and/or the Fifth Amendment may proceed along one of two evidentiary routes: (1) by showing underrepresentation of an identifiable group, the defendant may establish a prima facie presumption of intentional discrimination which the government may rebut; or (2) by using direct evidence of exclusion of an identifiable group, the defendant may demonstrate that the jury selection process was not race-neutral. *Id.* at 1099, 1104–05. We concluded that the plan at issue required the exclusion from the jury wheel of some non-African Americans, including Hispanics, solely on the basis of their race. We held that although the government has a compelling interest in ensuring that jury pools represent a fair cross-section of the community, the plan's use of race to exclude potential jurors from the jury wheel, albeit in an effort to further that compelling interest, was a means not narrowly tailored to achieve that end.

Because the issue was not before us, we did not address the issue of whether the jury selection plan was unconstitutional in any other respect. We explicitly said, however, citing *Peters v. Kiff,* 407 U.S. 493, 502, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) ("Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process."), that "[w]hen the government's jury selection plan discriminates against an identifiable group of citizens, both the defendant and those citizens who are excluded suffer

an injury in fact—the defendant is denied 'neutral jury selection procedures' and the excluded citizens are denied an opportunity to participate in an important civic requirement." *Ovalle,* 136 F.3d at 1103. Nothing in *Ovalle* limits challenges to the jury selection process in the Eastern District of Michigan to the grounds on which we invalidated the jury selection plan in that case. Nor is *Ovalle* somehow "unduly circumscribed ... in its application," as the lead opinion complains. Nothing in *Ovalle* suggests that "the African–American defendant who bases his challenge to the jury array under *Ovalle* is effectively left without any relief." Nothing in *Ovalle* requires that the defendant challenging the jury array be of a particular race, or requires that the race-selection preference at issue involve any particular race. Indeed, *Ovalle* recognizes that any defendant of any race has the right to challenge the jury selection process and to show that the jury was not selected in a race-neutral fashion, *id.* at 1103.

The lead opinion's attack on the *Ovalle* decision is substantively incorrect in a second significant respect. Citing those well-known civil cases in which a federal court has exercised its power of equitable jurisdiction to remedy a governmental institution's constitutional violation, the lead opinion asserts:

> [T]he *Ovalle* court should have invoked its equitable jurisdiction ... and considered the continuing constitutional violation left in the wake of its decision; and it should have remanded the case with instructions to the Eastern District of Michigan to devise a jury selection process that is constitutional as applied to *all* races and ethnic groups, while retaining jurisdiction to insure that the Eastern District so complied.

.　　.　　.　　.　　.

jury selection plan invalidated by *Ovalle,* he had waived his right to make such a challenge; because the defendant claimed that ineffective assistance of counsel was "cause," the court held that, even if he had shown cause, he must also demonstrate "actual prejudice," and that there was absolutely no evi-

dence of actual prejudice in the record. The court noted that since the jury selection plan the defendant complained of excluded non-black jurors from the jury wheel, and since the defendant was himself black, it was difficult to envision how that selection plan could have caused him actual prejudice.

The equitable jurisdiction afforded to a federal court is broad enough to have allowed the *Ovalle* court to have considered the plan at issue as applied to blacks under the Sixth Amendment right to a fair cross section of the community, as well as to have remanded the case with instructions to remedy the constitutionally infirm jury selection process which was left in place by virtue of the court's decision.

To suggest that this criminal appeal should be treated as a civil action for equitable relief, and used as a mechanism to invoke this court's equitable jurisdiction to impose an injunctive remedy simply is unprecedented. Not only does it ignore the statutory framework provided in the JSSA for devising and implementing jury selection plans for the United States District Courts, *see* 28 U.S.C. § 1863, and the specific statutory provisions for relief where there is a substantial failure to comply with the JSSA's requirements, *see* 28 U.S.C. § 1867, it goes well beyond the jurisdiction of this court, which in a criminal appeal, is limited to review of the final decision of the district court. *See* 18 U.S.C. § 1291.