NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0087n.06

No. 17-1439

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED**<br>Feb 23, 2018<br>DEBORAH S. HUNT, Clerk |
|  | ) | |
| Plaintiff-Appellee, | ) | |
|  | ) | |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| RA'KESIA T. GILBERT, aka Rakesia T. Gilbert | ) | COURT FOR THE WESTERN |
|  | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
|  | ) | |
|  | ) | |

Before: MOORE, THAPAR, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Ra'Kesia Gilbert was involved in a conspiracy to reencode gift cards with stolen debit and credit card numbers and then use those cards to purchase cigarettes to sell on the streets. For her involvement in the scheme, Gilbert was convicted of conspiracy to commit wire fraud, possession of fifteen or more counterfeit and fraudulent access devices, and aggravated identity theft. Gilbert appeals, claiming that the jury lacked sufficient evidence to convict her of aggravated identity theft, and that 18 U.S.C. § 1028A(b)(3) unlawfully limited the trial court's sentencing discretion. Neither of these claims has merit. We, therefore, AFFIRM Gilbert's convictions and sentences.

I.

Gilbert and her coconspirators were involved in a scheme to reencode gift cards with stolen debit and credit card numbers they purchased from China. Using the reencoded cards, the group would buy cigarettes in Michigan and Missouri to resell on the streets of Chicago.

Prior to her arrest, police twice stopped Gilbert and her coconspirators while they were driving. On March 4, 2016, Missouri state troopers pulled over Gilbert and two of her coconspirators. The officers searched the vehicle and found 227 gift cards and 17,600 cigarettes. Of the 227 gift cards, only thirteen had numbers encoded that matched the numbers on the front, and three had no numbers encoded at all. Some of the numbers on the cards "weren't imprinted well" and "didn't look authentic," according to an agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives. A few weeks later, on March 30, 2016, police in Michigan stopped Gilbert and her coconspirators after a convenience store clerk reported potential fraudulent credit card activity. The police found 169 gift cards and approximately sixty cartons of cigarettes in the vehicle. Only three of the cards were encoded with numbers that matched the numbers on the front of the card. Again, many of the cards showed indications of "very poor embossing." "[S]ome of the cards were so horribly [embossed] that you could not even make out certain digits of th[e] account number." Additionally, some of the cards had numbers that were not in a straight line, with "some of the numbers [being] higher and lower than others and not consistent." One card had "a second set of embossed numbers that [wa]s both upside down and backwards."

Gilbert was charged with conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349; possession of fifteen or more counterfeit and fraudulent access devices,[1] 18 U.S.C. § 1029(a)(3); and aggravated identity theft, 18 U.S.C. § 1028A(a)(1). A jury convicted her of all three offenses. At sentencing, the district court determined that the advisory Guidelines range on the first two counts was 41 to 51 months. The district court rejected Gilbert's argument that her mandatory consecutive 24-month prison sentence for aggravated identity theft should result in a discount on her sentences for the first two counts, noting that 18 U.S.C. § 1028A(b)(3) prohibited such a consideration. Nevertheless, the district court sentenced Gilbert below the Guidelines to 27 months' imprisonment on the first two counts, considering the actual amount of loss, the overlap in Guidelines factors for this type of fraud case, the number of victims, and defendant's criminal history.

On appeal, Gilbert argues that the jury lacked sufficient evidence to convict her of aggravated identity theft and that 18 U.S.C. § 1028A(b)(3) unlawfully prohibited the district court from considering her mandatory sentence for aggravated identity theft when sentencing her on the other counts for which she was convicted.

## II.

We review de novo Gilbert's claim that there was insufficient evidence to convict her of aggravated identity theft. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000). We consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

---

[1] An access device is a "card, plate, code, account number . . . or other means of account access that can be used . . . to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds . . . ." 18 U.S.C. § 1029(e)(1).

"'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.' The jury may draw any reasonable inferences from direct, as well as circumstantial, proof." *Id.* (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)) (citation omitted).

The jury found Gilbert guilty of aggravated identity theft under two different theories of liability: personal participation and *Pinkerton* liability. Under *Pinkerton*, once Gilbert joined the conspiracy, she was responsible for any reasonably foreseeable substantive offenses committed by her coconspirators in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946). Because we find that there was sufficient evidence from which a rational jury could find Gilbert guilty beyond a reasonable doubt under *Pinkerton*, we need not decide if there was also sufficient evidence to sustain a conviction under a theory of personal participation.[2]

Gilbert was involved in a conspiracy to commit wire fraud,[3] in which she and her coconspirators reencoded gift cards with stolen debit and credit card numbers and used the gift cards to purchase cigarettes for resale. In order for Gilbert's involvement in this scheme to

---

[2] At oral argument, Gilbert briefly argued that finding her guilty of aggravated identity theft under *Pinkerton* would violate the Sixth Amendment by excusing the prosecution from proving that she had actual knowledge. Gilbert did not raise this argument in her written submissions to this Court, and we generally do not consider arguments that are raised for the first time before this Court at oral argument. *See* Fed. R. App. P. 28(a)(8)(A); *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 450 n.6 (6th Cir. 2008).

[3] An individual has committed wire fraud if she:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . .

18 U.S.C. § 1343.

render her liable for aggravated identity theft under *Pinkerton*, the jury had to determine that, after Gilbert joined the conspiracy and while she was still a member of it, one of her coconspirators committed that offense in furtherance of the conspiracy, and that commission of the offense was within the reasonably foreseeable scope of the conspiracy. *Pinkerton*, 328 U.S. at 647–48.

At trial, Gilbert's coconspirator, Anthony Gooden, admitted all the facts necessary for a rational jury to find the first three elements: that he committed aggravated identity theft, in furtherance of the conspiracy, while Gilbert was a member of it.[4] A person has committed aggravated identity theft if (1) he knowingly transferred, possessed, or used the means of identification of another person; (2) he knew that the means of identification belonged to another person; (3) the means of identification was used without lawful authority; and (4) the means of identification was used during and in relation to wire fraud or access device fraud. 18 U.S.C. §§ 1028A(a)(1), 1028A(c)(4), (5); *Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009). At trial, Gooden testified that, as part of the conspiracy, he wired money via Western Union to China to obtain stolen credit card numbers.[5] Gilbert concedes that Gooden's testimony

---

[4] Like Gilbert, Gooden was charged with aggravated identity theft, but this charge was dropped pursuant to a plea deal in which he agreed to testify against Gilbert.

[5] A credit card number belonging to another person is a means of identification of that person. *See* 18 U.S.C. § 1028(d)(7)(D) ("[T]he term 'means of identification' means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . telecommunication identifying information or access device (as defined in section 1029(e))."); 18 U.S.C. § 1029(e)(1) (defining "access device" as "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely be paper instrument)").

established that he knew that he was purchasing credit card numbers that belonged to people who had not given him permission to use the cards.[6] He stated that another member of the conspiracy then had the gift cards reencoded with the stolen credit card numbers. He testified that he, Gilbert, and two others would use the reencoded gift cards to purchase cigarettes for resale in Chicago. A rational jury could therefore conclude that Gooden had committed aggravated identity theft in furtherance of the conspiracy to commit wire fraud. A rational jury could also conclude that the substantive crime Gooden committed occurred while Gilbert was a member of the conspiracy, as Gooden testified that Gilbert and her boyfriend recruited him into the conspiracy and there is no evidence that Gilbert ever left.

The final question, then, is whether a rational jury could have found that it was reasonably foreseeable that a member of the conspiracy would commit aggravated identity theft in furtherance of the conspiracy to commit wire fraud. *See Pinkerton*, 328 U.S. at 648 (distinguishing the case from one in which the substantive offense of a coconspirator "was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement"). The government presented significant evidence that Gilbert was aware that the gift cards used in the scheme were reencoded with sixteen-digit numbers purchased from China and that the reencoded cards could then be used to buy merchandise. There was no evidence to suggest that any precautions were taken to ensure that these were not credit or debit card numbers belonging to actual people. Therefore, a rational jury could find that it was reasonably foreseeable that at least one member of the conspiracy would purchase at least one sixteen-digit number knowing that it was a credit card number belonging to a real person—in other words, that one of her coconspirators would commit

---

[6] While Gilbert spends much of her briefing arguing that *she* did not know that the stolen numbers obtained from China belonged to other people, she concedes that *Gooden* knew.

aggravated identity theft. *See Tocco*, 200 F.3d at 424 ("The jury may draw any reasonable inferences from direct, as well as circumstantial, proof." (citation omitted)).

Gooden testified that he wired money via Western Union to China to obtain stolen credit card numbers and that $500.00 would buy fifty stolen numbers. Gooden also testified that he, Gilbert, and their two coconspirators discussed wiring money to Western Union to get the numbers. Moreover, the prosecution introduced receipts showing that Gilbert herself had sent money via Western Union to China on more than one occasion, including sending $500.00 to Yanming Wang in Shenzhen, China—the same person from whom Gooden admitted to purchasing stolen credit card numbers. After her arrest, Gilbert admitted to a fellow detainee, Jasma Allen-James, that she was in custody for credit card fraud and that she, her boyfriend, and two other men had been buying cigarettes with credit cards. Gilbert told Allen-James that "you have to buy these cards and then you have to have a machine, and that's how you load the funds onto it, with the machine. It's a reader and a writer." The prosecution also introduced evidence that many of the cards seized during the two traffic stops showed physical signs of tampering and indications of re-embossing. Additionally, the prosecution presented ample evidence to show that the reencoded gift cards worked: Gooden's testimony, receipts for purchases made with the cards, and video surveillance all demonstrated that Gilbert and her coconspirators were able to successfully use many[7] of the compromised card numbers to purchase cigarettes. In the context of this conspiracy to commit wire fraud involving reencoded gift cards, a rational jury could conclude that it was reasonably foreseeable that one of the coconspirators would knowingly purchase stolen credit and debit card numbers belonging to real people. Accordingly, there was

---

[7] Not every card number was usable. Gooden testified that he, Gilbert, and two others worked together and, if a card did not work at the point of sale, someone else in the group would give the cigarette purchaser another card.

-7-

sufficient evidence to support Gilbert's conviction for aggravated identity theft under the *Pinkerton* theory of liability.

## III.

Gilbert next challenges her sentences on the first two counts of the indictment: conspiracy to commit wire fraud and possession of fifteen or more counterfeit and fraudulent access devices. At her sentencing hearing, Gilbert argued that the court should "depart to an extraordinary level" when sentencing her on those two counts in light of the mandatory consecutive sentence of 24 months' imprisonment on count three, aggravated identity theft. The district court rejected this argument, correctly holding that such consideration is expressly prohibited by 18 U.S.C. § 1028A(b)(3), which states:

> [I]n determining any term of imprisonment to be imposed for the felony during which the means of identification was [used], a court *shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account*, any separate term of imprisonment . . . imposed for a violation of this section . . . .

*Id.* (emphasis added). The district court nonetheless sentenced Gilbert below the advisory Guidelines range (41–51 months) on the first two counts, imposing a 27-month sentence after considering the amount of loss, the overlap in Guidelines factors, the number of victims, and Gilbert's criminal history. The district court also imposed the mandatory consecutive sentence of 24 months' imprisonment on count three.

Gilbert now concedes that § 1028A(b)(3) prohibited the district court from accounting for the mandatory two-year sentence for aggravated identity theft when fashioning a sentence on the other counts. She instead argues, for the first time in this court,[8] that the operation of

---

[8] Failure to present arguments in the district court ordinarily results in plain error review on appeal. The government, however, has not asked that we apply the plain error standard. Ultimately, it makes no difference which standard we apply because there was no error here.

§ 1028A(b)(3) renders her sentence on the other two counts either substantively unreasonable or unconstitutional. Her arguments are meritless.

Gilbert claims first that her sentences on counts one and two were substantively unreasonable because § 1028A(b)(3) forbade the district court from employing the full range of discretion afforded to it by 18 U.S.C. § 3553(a).[9] Congress may, however, override the general sentencing provisions of § 3553 in specific sentencing statutes, as it expressly did in § 1028A(b)(3). The Supreme Court, in fact, has pointed to § 1028A's language as "a clear way to bar consideration of a mandatory minimum." *See Dean*, 137 S. Ct. at 1178. Gilbert's sentences on counts one and two were not rendered substantively unreasonable by the district court's following Congress's express command.

Gilbert next argues that the Sixth Amendment prohibits Congress from curtailing the district court's discretion to consider her mandatory sentence for aggravated identify theft when imposing sentence for the underlying offenses. But nothing in the Sixth Amendment entitles defendants to unlimited judicial discretion in sentencing. *See United States v. Wimbley*, 553 F.3d 455, 462–63 (6th Cir. 2009) ("[T]here is no doubt that Congress has authority to limit judicial discretion, or even eliminate it altogether . . . ." (citation omitted)). If it were otherwise, the mandatory consecutive sentence required by § 1028A and imposed upon Gilbert for count three of the indictment would itself be unconstitutional. But Gilbert, with good reason, concedes that such is not the case. Mandatory sentences were commonplace at the Nation's founding and are consistent with the Sixth Amendment, so long as juries, rather than judges, make the factual

---

[9] As the Supreme Court has explained, "[t]he § 3553(a) factors are used to set both the length of separate prison terms and an aggregate prison term comprising separate sentences for multiple counts of conviction." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. §§ 3582(a), 3584(b).

determinations necessary to authorize them. *See Apprendi v. New Jersey*, 530 U.S. 466, 478–83 (2000). If Congress is free to eliminate judicial discretion by prescribing a mandatory sentence for one of Gilbert's convictions, the same principle dictates that Congress may constitutionally curtail judicial discretion to discount the sentence on other counts to compensate for the mandatory sentence. Congress, in § 1028A, has done so in the clearest terms. The Constitution commands no more.[10]

Neither 18 U.S.C. § 3553(a) nor the Sixth Amendment prohibits legislative limitations on judicial discretion in sentencing like that set forth in § 1028A(b)(3). Accordingly, we reject Gilbert's claim that 18 U.S.C. § 1028A(b)(3) is unconstitutional and affirm her sentences.

\* \* \*

For the reasons above, we AFFIRM Gilbert's convictions and sentences.

---

[10] To the extent that Gilbert argues that her sentences are unconstitutional because the district court engaged in judicial factfinding, this argument fails because she has identified no fact that the sentencing judge impermissibly found. *Cf. Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").