UNITED STATES of America,
Plaintiff–Appellee,

v.

Hamood ABDULLAH, Defendant–Appellant.

No. 97–1839.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 27, 1998.

Decided Nov. 30, 1998.

898

James C. Thomas (argued and briefed), Detroit, Michigan, for Defendant–Appellant.

Cynthia J. Oberg (argued and briefed), Office of the U.S. Attorney, Detroit, Michigan, for Plaintiff–Appellee.

Before: GUY, DAUGHTREY, and MOORE, Circuit Judges.

## OPINION

DAUGHTREY, Circuit Judge.

The defendant, Hamood Abdullah, appeals his conviction for the illegal receipt and possession of contraband cigarettes and his sentence of 21 months, followed by two years of supervised release. In addition, Abdullah was held jointly and severally liable with other individuals involved in a contraband cigarette distribution network for restitution in the amount of $82,125.00. On appeal, the defendant raises numerous trial and sentencing issues, all of which we find to be without merit—except his challenge to the sufficiency of the evidence to support the calculation of his sentence. We therefore affirm the conviction, based on the verdict of the jury, but remand for a further hearing on Abdullah's sentence.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 1, 1994, the Michigan excise tax on a pack of cigarettes sold in the state tripled from 25 cents per pack to 75 cents per pack. Federal and state agents consequently increased their efforts to ensure that cigarettes were not being brought into the state and sold without payment of the required assessment. The investigation by officials of the Bureau of Alcohol, Tobacco and Firearms and the State of Michigan focused on the Dearborn homes of co-defendants Adel Alawi and Hassan Ilayan, both brothers-in-law of Hamood Abdullah. In early September 1994, agents conducted surveillance on the

two residences, which were located around a corner from each other. Agents also pulled trash from garbage cans outside the homes and found records of cigarette orders, maps of New York State, phone bills, customer lists, and mail addressed to the defendant. The phone bills retrieved from that trash pull, as well as information obtained from a second trash pull at the residences in late October 1994 and from telephone toll records, revealed numerous calls made from the Dearborn homes to Lance Hoag at American Indian Crafts and to Roseine's, smoke shops located on Native American lands in New York State.

Finally, on November 3, 1994, the surveillance activities paid off. Law enforcement officers followed Ilayan from one of the houses being watched and observed him drive his van to a parking lot, park next to a large Ryder rental truck, and then drive away in the truck. Eventually, Ilayan was arrested when he stopped at Abdel Khidir's South Town Market and began unloading cases of cigarettes that did not bear Michigan tax stamps. Agents not only seized more than 7,100 cartons of contraband cigarettes from the truck and the market, but also uncovered documentary evidence that the untaxed cigarettes had been purchased the previous day from Lance Hoag in Salamanca, New York. Because Hoag's establishment was located on a Native American reservation, no excise tax had been paid on any of the goods, a fact which would allow the retailer to reduce prices significantly.

After his arrest, Ilayan consented to a search of the van he had driven from his home to the lot where the Ryder truck had been parked. During that search, police found Hamood Abdullah's identification card and a receipt for a storage locker originally rented by the defendant through October 31, 1994, and then extended through November 15, 1994.

Later that same evening, officials approached Ilayan's house with a search warrant and were allowed access to the dwelling by Ilayan himself. In the course of the search, officers found lists of brands of cigarettes and quantities to be purchased, as well as a receipt for a payment of $78,501.31.

The defendant was in the kitchen of the home at the time and spoke fluently and coherently in English with the officers for 15–20 minutes about several topics, including the civil war raging in Abdullah's native Yemen. Moreover, when confronted with the existence of the receipt for the storage locker, the defendant insisted that he was merely storing furniture for a relative but that the locker was then empty and could be searched. Because the storage facility was closing for the evening, the officers asked Abdullah whether they could search the locker the next morning; the defendant agreed. Abdullah did not, however, respond to knocks on the door the next day. Consequently, the agents involved in this case returned to the storage locker without the defendant and conducted a search that revealed approximately 1,870 additional cartons of untaxed cigarettes and an empty case of contraband cigarettes bearing writing indicating that the goods were also purchased from Lance Hoag's American Indian Crafts in New York.

Abdullah was arrested and indicted for trafficking in contraband cigarettes and for receipt and possession of contraband cigarettes. At trial, the government adduced testimony concerning the activities leading to the apprehension of Ilayan and Abdullah. In addition, evidence was offered that neither Abdullah nor his co-defendants were licensed in Michigan as wholesalers of cigarettes, that the defendant's fingerprints were found on some of the cigarette order and sale documents recovered during the search of Ilayan's residence, and that Abdel Khidir, the owner of the South Town Market, admitted purchasing untaxed cigarettes directly from Abdullah on at least three occasions in 1994.

Abdullah testified in his own defense and denied any connection with the purchase or storage of untaxed cigarettes. He also claimed that he had rented the storage locker in which the contraband cigarettes were found only through October 1994 and that he stored only furniture in that facility. Abdullah further attempted to offer an innocent explanation for the presence of his fingerprints on incriminating documents, stating that he must have handled those papers while looking for missing photographs during

his visit to Dearborn. The defendant also offered an alibi for his whereabouts during late July 1994, and highlighted the testimony of Ilayan who attempted to exonerate Abdullah of all wrongdoing. Although the jury acquitted Abdullah of the trafficking charge, it found the defendant guilty of receipt and possession of contraband cigarettes. After a sentencing hearing, the district court imposed judgment upon Abdullah, requiring, among other punishments, the service of 21 months in prison and the payment of $82,125 in restitution.

## DISCUSSION

### I. Federal Jurisdiction Over Possession Of Contraband Cigarettes

■ Although first raised in a proceeding held after his conviction by a jury, Abdullah challenges the jurisdiction of the federal courts to criminalize what the defendant categorizes as state tax law violations, citing *United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In that case, the Supreme Court "identified three broad categories of activity that Congress may regulate under its commerce power."

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. 1624 (citations omitted).

The government contends that the statutory prohibitions on trafficking in contraband cigarettes actually regulate "the use of the channels of interstate commerce" and thus are a proper exercise of the federal government's criminal jurisdiction. The purpose of the ban on receipt or possession of untaxed cigarettes is not, however, to keep open the very avenues by which interstate commerce is transacted. Furthermore, the statute does nothing to regulate the instrumentalities of commerce. Instead, any federal authority over the possession of such contraband must be grounded in Congress's power to "regulate those activities having a substantial relation to interstate commerce."

Unlike the activities regulated by the Gun-Free School Zones Act, 18 U.S.C. § 922(q)(1)(A), under consideration in *Lopez*, contraband cigarette trafficking involves an inherently commercial or economic enterprise—the dealing of untaxed products in order to create a higher profit margin for unscrupulous retailers. Second, although 18 U.S.C. §§ 2341–2346 do not contain an explicit jurisdictional element that would ensure the presence of an effect upon interstate commerce, the legislative history of these statutes, again unlike the law at issue in *Lopez*, unmistakably recognizes the pervasive effects of cigarette smuggling on interstate commerce. For example, the Senate Report on the bill that eventually became P.L. 95–575 (18 U.S.C. §§ 2341–2346) states that the purpose of the legislation "is to provide a timely solution to the serious problem of organized crime and other large scale operations of *interstate cigarette bootlegging* and to help provide law enforcement assistance and relief to cities and States." S.Rep. No. 95–962, at 3 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5518 (emphasis added).

The report then continues by explaining how large profits may be generated and legitimate businesses harmed by the unchecked practice of smuggling cigarettes from a low-tax state to a high-tax state for retail sale. S.Rep. No. 95–962, at 4–8 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5518–23. Finally, the report concludes that, "because of the interstate nature of the problem," federal legislation is needed to address the deficiencies engendered by the jurisdictional limitations of the individual states affected by the practices. S.Rep. No. 95–962, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5524. Thus, the legislative history of the statutes relevant to this criminal prosecution expressly concludes that the evils addressed by the legislation substantially burden interstate commerce.

■ Moreover, "*Lopez* did not proclaim a general rule that all federal criminal statutes must include a jurisdictional element." *United ed States v. Tucker,* 90 F.3d 1135, 1141 (6th Cir.1996). As long as a statutory scheme regulates economic activity that Congress could rationally determine has a substantial effect on interstate commerce, the criminal law remains constitutional, even after *Lopez.* See *United States v. McHenry,* 97 F.3d 125, 128–29 (6th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 992, 136 L.Ed.2d 873 (1997). In this case, the government adduced credible evidence to establish that the contraband cigarettes connected to the defendant were transported to Michigan from New York without payment of the appropriate taxes, and that such smuggling has a profound effect on both the nature of and the participants in interstate commerce. Abdullah's jurisdictional challenge to this prosecution is, therefore, without merit.

## II. Legality Of Search Of Storage Locker

■ In a second allegation of error, the defendant insists that the district court should have suppressed all evidence obtained from the search of the storage locker rented by Abdullah because knowing and voluntary consent for the search was not given. The defendant argues that he was, at the time of the search, a relatively recent arrival to the United States from Yemen and that he was not then fluent in nor comfortable with the English language. In response, the government asserts that the issue of consent need not be visited on this appeal because, as found by the district court, Abdullah admitted he had no possessory interest in the storage locker after October 31, 1994, four days prior to the search at issue.

■ Fourth Amendment jurisprudence is now well-settled that protections from unreasonable searches and seizures do not depend "upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Because

Abdullah firmly and unequivocally denied that he had extended the rental agreement for the storage locker beyond October 31, 1994, the district court did not err in concluding that the defendant had no reasonable expectation of privacy in the locker and, therefore, no standing to contest the search of it.

■ Even if Abdullah had standing to contest the search, however, it is clear that he gave a valid consent to the search. The district judge discredited the defendant's claims that he was unable to understand the search request. Instead, the court explicitly found "as a matter of fact that the testimony of [the police officers] was credible, that there was a consent given, and I find the testimony of Mr. Abdullah is not credible as to the consent."

■ The question of whether a consent to search is voluntary and knowing is a question of fact to be determined from the totality of all the circumstances. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Moreover, the burden of establishing the validity of the consent is upon the government. *Id.* In this case, the district court did not clearly err in concluding that the government proved Abdullah's consent to search was knowing and voluntary. Numerous individuals testified to the circumstances surrounding the request for consent and explained that the atmosphere during the conversations with the defendant were congenial, that Abdullah spoke freely, intelligently, and at length with the officers about other subjects, and that the defendant seemed to understand the requests made of him. We thus find no merit to the defendant's challenge to the legality of the search of the storage unit.

## III. Sufficiency Of The Evidence

■ Abdullah also alleges that the government failed to adduce sufficient evidence at trial to support his conviction for receiving and possessing contraband cigarettes. In addressing such a challenge, we do not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v.*

*Hilliard,* 11 F.3d 618, 620 (6th Cir.1993). Instead, we must determine merely whether, after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any rational trier of fact could find the elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

 Where, however, a defendant fails to renew a motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29 at the close of all proofs, "appellate review is limited to determining whether there was a manifest miscarriage of justice." *United States v. Price,* 134 F.3d 340, 350 (6th Cir.1998) (internal quotation marks and citations omitted), *cert. denied,* —— U.S. ——, 119 S.Ct. 114, 142 L.Ed.2d 91 (1998). "A 'miscarriage of justice' exists only if the record is 'devoid of evidence pointing to guilt.'" *Id.*

No such miscarriage of justice is present in this matter. During trial, the government offered evidence from which a rational trier of fact could find Abdullah guilty beyond a reasonable doubt of the crime for which he was convicted. The defendant attempted to offer legitimate explanations for his activities at the times relevant to the discovery of the contraband cigarettes on November 3 and 4. The jury, however, obviously credited testimony from government witnesses that Abdullah was not licensed as a cigarette wholesaler, that he was directly involved with sales of contraband cigarettes to Abdel Khidir on at least three occasions, that the defendant arrived in Dearborn at approximately the same time that a large shipment of contraband cigarettes arrived from New York, that Abdullah's fingerprints were found on cigarette order sheets, that Ilayan originally stated to police that he was delivering contraband cigarettes for another individual, and that the storage locker in which some of the contraband was found was rented out in Abdullah's name. Because the record on appeal is thus not *devoid* of any relevant proof of guilt, no miscarriage of justice has occurred in this matter such that the defendant would

be entitled to relief from the judgment of conviction entered against him.

## IV. Introduction Of Evidence Of Other Bad Acts

 Abdullah maintains that his conviction should be reversed because of the prejudicial introduction of evidence of other bad acts alleged to have been committed by him. As noted by the district court in its analysis of this contention, however, the defendant himself, through counsel, elicited the very testimony that he now highlights to support his claim for reversal of his conviction. In relevant part, the following colloquy on cross-examination of a Michigan State Police sergeant forms the basis for Abdullah's allegation of error:

Q: Now, prior to this time, you never saw or heard of Mr. Abdullah, the defendant; is that right?

A: That's correct.

Q: Or in any way had him implicated in any drug trafficking—I mean, not drug, but cigarette trafficking; isn't that right? Prior to this time.

A: No, I believe there's information of involvement in New York.

Q: See, I mean you have information, I believe. What is that information?

A: Can we—are we permitted to discuss that?

Q: You said you had information that Mr. Abdullah was dealing in cigarettes in New York. That's what you left the jury with the impression of; is that right? Show me that information. You keep looking at Mr. Macek. Don't you know yourself?

A: Can we produce that here?

Q: Well, you are asking—

THE COURT: Let him respond to the question.

A: I believe it can be produced, yes.

Q: And where is that information?

A: It's historical information we have in our files.

Q: Historical information? Who keeps that file?

A: Well—

Q: I'm listening. I'm waiting.

A: I believe his name had come up with trafficking in New York.

Q: You believe but, therefore, you don't have the information written anywhere period?

A: It's documented.

Shortly after that exchange, the district judge adjourned court for the evening. The following morning, he instructed the jury:

There was some reference in the testimony of Mr. Ward who was on the stand yesterday, some reference with dealing with cigarettes in New York. I want to make it perfectly clear to you, members of the jury, he is not charged, the Defendant is not charged with trafficking in contraband cigarettes in New York. You should disregard any of that testimony. The charge against him is trafficking in contraband cigarettes, receiving contraband cigarettes, and distributing in Michigan, here, not in New York. Any testimony that you heard to anything in New York, he has not been charged with, and you should completely put that out of your mind, and remember that we are dealing here in Michigan, and not New York.

At that point, the questioning of Sergeant Ward continued. Defense counsel inquired:

Q: Okay. Now, did you see Mr. Abdullah anytime thereafter, the Defendant?

A: Immediately thereafter, or from then to now?

Q: Not from then to now, but then till—well, when's the next time you saw him? I don't mean now, but after that, when's the next time?

A: May I—can we get into that?

At that point, the jury was again dismissed and the court asked Ward when he next saw Abdullah after November 1994. Ward responded that his contact with the defendant involved another case of cigarette smuggling in Troy, Michigan. Consequently, the district judge ruled that defense counsel could only inquire whether Ward had seen Abdullah again "with reference to this case." When the jury returned to the courtroom, therefore, defense counsel asked bluntly, "Did you see the Defendant subsequently after leaving that group concerning this case?" The witness responded, "Concerning this case, no."

On appeal, the defendant maintains that he was prejudiced by the admission of testimony regarding Abdullah's connection with other incidents of cigarette smuggling. Decisions regarding the admission of certain evidence or to deny a motion for mistrial are, however, reviewed only for an abuse of discretion. See United States v. Bonds, 12 F.3d 540, 554 (6th Cir.1993); United States v. Carroll, 26 F.3d 1380, 1383 (6th Cir.1994). No such abuse of discretion can be substantiated in this case. A review of the transcript of defense counsel's cross-examination of the prosecution witness who offered the allegedly damaging information reveals that the defendant's own attorney elicited the testimony to which he now objects. Furthermore, we have previously held that a reviewing court must presume that jurors complied with cautionary instructions offered by the district court. See United States v. Sivils, 960 F.2d 587, 594 (6th Cir.1992). See also Zafiro v. United States, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Under such circumstances, we cannot conclude that reversible error occurred as a result of the testimony that may have implicated Abdullah in other crimes.

## V. Denial Of An Interpreter From The Start Of The Trial

Abdullah also claims the district court erred in not allowing him the use of an interpreter until the fifth day of trial. The defendant mischaracterizes the district judge's ruling on this matter, however. At the close of testimony offered at a suppression hearing held ten months prior to trial, the district court made a factual finding that Abdullah was able to communicate knowingly and intelligently with law enforcement officials at the time he granted consent to search the storage locker rented by him. The judge then explained:

Now, if the defendant wants to bring an interpreter for trial, he is perfectly—I am perfectly willing to have him do so. I don't feel that I have the necessity to do that now because the testimony I have heard

and because of the circumstances surrounding him. I think he understands the English well enough that I don't have to have an interpreter. However, if the defendant wants to have one, it's his business and he may have one. But I wanted the record to be absolutely clear of my position on the interpreter and his ability to have understood the language of the officers.

In fact, Abdullah did procure, at his own expense, the services of an interpreter for all but the first four days of his trial. Given the finding by the district judge concerning the defendant's ability to understand English, the lack of clear error in that finding, the fact that Abdullah did not renew his request for an interpreter until the fifth day of trial, defense counsel's refusal to agree to a mistrial based upon the lack of interpretive assistance, and the fact that the defendant did have the assistance of such an interpreter for the all those legal proceedings he wished, we are not convinced that Abdullah was denied a fair trial on this basis.

### VI. Ineffective Assistance Of Counsel

 The defendant alleges that his trial counsel was ineffective by failing to take necessary steps to pursue an alibi defense for Abdullah. In support of his claim, the defendant points to the fact that the district court refused to include an alibi instruction in the jury charge because defense counsel had not filed a timely and complete notice of alibi with the court and with the prosecution.

 Ordinarily, we will not entertain claims of ineffective assistance of counsel that have not first been analyzed by the district court. *See United States v. Hill*, 142 F.3d 305, 308 (6th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 225, 142 L.Ed.2d 185 (1998). The better practice is to bring such allegations in a post-conviction proceeding pursuant to 28 U.S.C. § 2255 in which the parties are able to develop an adequate record on the issue. *Id.* When, however, the record on appeal is sufficient to address the merits of the defendant's claims, this court may nevertheless resolve the substantive issue before it. *See United States v. Wunder*, 919 F.2d 34, 37 (6th Cir.1990) (per curiam).

Here, we have before us all information necessary to determine that defense counsel's representation was not so deficient under the analysis set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as to mandate a retrial. Although Abdullah's attorney clearly did not take the necessary steps to file an adequate notice of alibi pursuant to the requirements of Fed.R.Crim.P. 12.1, the record on appeal also clearly indicates that Abdullah was allowed to present the testimony of his alibi witnesses to the jury without restriction. Because the defendant is thus unable to establish prejudice resulting from his counsel's alleged ineffectiveness, we find that this issue is without merit.

### VII. Failure Of The District Court To Grant A Downward Departure In Sentence

 In his final two issues on appeal, Abdullah challenges sentencing determinations made by the district court. First, he contends that the district judge erred in failing to grant him a downward departure in his sentence due to his "minimal participation, his lack of a prior record, the absence of violence in the charged conduct and the need to care for his child and wife." As we have previously held, however, if the district court "was not unaware of its discretion to depart from the guideline range, and the sentence was not imposed in violation of law or as a result of an incorrect application of the guidelines, the failure to depart is not cognizable on appeal." *United States v. Hamilton*, 949 F.2d 190, 192 (6th Cir.1991) (per curiam) (citations omitted).

During the sentencing hearing in this case, the district judge clearly expressed recognition of his discretion to depart from the guideline range in imposing punishment upon Abdullah and entertained argument on the efficacy of such a departure. In the end, however, he explicitly chose not to do so and stated, "But I do not feel that I can depart from the Guidelines. I think it's a serious offense. I think he is clearly guilty. I think the jury's verdict was well justified. I think he was clearly involved in the importation

and distribution of these cigarettes." In such a situation, because the sentence was imposed in accordance with applicable law and with the guidelines, we have no jurisdiction to entertain this allegation of error on appeal.

### VIII. Calculation Of Offense Level

 In his final contention of error, Abdullah contends that the district court erroneously assigned an offense level of 14 to him based upon the amount of excise taxes evaded in the course of the cigarette smuggling activities. Such a determination by the sentencing court involves a factual finding that we review only for clear error. *See United States v. Wright*, 12 F.3d 70, 72 (6th Cir.1993). "While guilt beyond a reasonable doubt is still the standard of proof required in the direct criminal proceeding, the level of proof needed to establish the facts relevant to a sentencing decision is the lower preponderance of the evidence standard." *United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir.1994).

Pursuant to the provisions of U.S.S.G. § 2E4.1(a), criminal conduct relating to contraband cigarettes will be assigned a base offense of 9 or, if greater, "the offense level from the table in § 2T4.1 (Tax Table) corresponding to the amount of the tax evaded." The Tax Table of § 2T4.1 assigns an offense level of 14 to conduct involving between $70,001 and $120,000 in lost taxes. U.S.S.G. § 2T4.1(I). Consequently, because the contraband cigarettes obtained from Native American reservations were purchased without payment of any excise tax and those same cigarettes would have been taxed at a rate of $7.50 per carton in Michigan, the district court was required to find, by a preponderance of the evidence, that Abdullah was involved in the smuggling of at least 9,334 cartons of cigarettes to justify sentencing pursuant to offense level 14.

In determining the appropriate sentencing range for the defendant, the district court adopted the probation office's finding that more than 10,900 cartons of cigarettes without tax stamps were involved in Abdullah's activities. Based on the record before us, however, we are unable to say with reasonable certainty that a preponderance of the evidence in the record supports that conclusion.

Testimony was offered that some 7,100 cartons of contraband cigarettes were seized on November 3, 1994, from Abdel Khidir's market and from the truck driven by Ilayan delivering to that establishment. And, approximately 1,870 cartons of untaxed cigarettes were recovered the following day from the storage locker rented in the defendant's name. Finally, the district court found relevant to the sentencing determination the 2,010 cartons of cigarettes included on the early October order forms and receipts that were found with Abdullah's fingerprints on them. Because those three quantities alone accounted for more than the requisite 9,334 cartons of contraband cigarettes, the district court held that the offense level 14 was applicable to the defendant.

After a careful review of the record, we are concerned that the proof fails to show whether the receipts that carried the defendant's fingerprints applied to cigarettes in the delivery truck, to those found in the storage shed, or to an entirely different shipment of contraband. It would, of course, constitute an error in sentencing if the same cigarettes were "double-counted." We therefore find it necessary to remand the case to the district court to develop the record more fully, in order to support the imposition of a sentence based on an offense level of 14.

### CONCLUSION

For the reasons set out above, we **AFFIRM** the defendant's conviction but **REMAND** the case for a new sentencing hearing.