NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0853n.06
Filed: November 21, 2006

No. 05-5958

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| GEORGE BRYANT, | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

**Before: GILMAN and GRIFFIN, Circuit Judges; and GWIN, District Judge.**[*]

**RONALD LEE GILMAN, Circuit Judge.** A federal grand jury indicted George Bryant, Crystal Keel, Scottie Magouirk, and Richard Whited on ten counts relating to the manufacture and use of methamphetamine. Following a jury trial in Bryant's case and guilty pleas in the cases of Keel, Magouirk, and Whited, the district court imposed sentences of 100, 188, 151, and 151 months in prison, respectively. Bryant raises the following two challenges to his convictions: (1) that the evidence presented at trial was insufficient to support them, and (2) that the district court's allowance of certain unobjected-to testimony by a government witness constituted plain error and requires reversal. He raises no challenges to the length of his sentence. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

---

[*]The Honorable James S. Gwin, United States District Court for the Northern District of Ohio, sitting by designation.

# I.  BACKGROUND

## A.     Procedural background

A federal grand jury charged Bryant in three counts of the ten-count indictment that also named Keel, Magouirk, and Whited.  Count One charged all four individuals with a conspiracy to knowingly manufacture methamphetamine between January of 2001 and April 22, 2004, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846.  Under Count Nine, the grand jury charged Bryant and Whited with the related crime of aiding and abetting each other in knowingly attempting to manufacture methamphetamine on April 22, 2004, in violation of the same three statutes as well as 18 U.S.C. § 2.  Count Ten similarly charged Bryant and Whited with aiding and abetting each other on April 22, 2004 in knowingly possessing equipment, chemicals, products, and materials that could be used to manufacture methamphetamine, with the additional knowledge that such materials would in fact be used to manufacture methamphetamine, all in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2.  Unlike his codefendants, who pled guilty, Bryant demanded a jury trial.  A one-day jury trial on February 23, 2005 resulted in a verdict of guilty as to all three counts against him.  On June 6, 2005, the district court sentenced Bryant to 100 months in prison.  This timely appeal followed.

## B.     Factual background

The government called only two witnesses at Bryant's trial:  Dale Hesketh, an agent with the Tennessee Alcoholic Beverage Commission, and Josh Melton, an agent with the Commission as well as a task-force officer with the federal Drug Enforcement Administration (DEA).  Bryant does not dispute either agent's testimony or the physical evidence introduced against him.  He instead

contends that, taken together, the testimonial and physical evidence was insufficient to support his convictions. The relevant facts are set forth below.

### 1. *The search of Whited's trailer*

Hesketh and Melton went to Whited's trailer on April 22, 2004 to execute a state arrest warrant for Whited. Based on Melton's work with the DEA, the agents had reason to believe that Whited and others were manufacturing methamphetamine on the premises. After Melton found Whited alone in a detached garage near the trailer, he placed Whited under arrest. Melton then asked Whited for consent to search the premises. Whited agreed, and led the agents to the back door of the trailer, which he opened with the assistance of those inside. Upon entering, Hesketh immediately noticed Bryant and another man, later identified as Chad Campbell, seated on the floor of a bedroom directly in front of where Hesketh was standing. After identifying himself as a law-enforcement officer and after asking Bryant and Campbell to stand with their hands up, Hesketh performed a pat down of Bryant. Hesketh found and seized a single glass pipe in Bryant's pocket as well as several more glass pipes and a blue plastic envelope elsewhere on Bryant's person. A lab test later determined that the substance in the envelope was methamphetamine.

Hesketh then escorted Bryant and Campbell to Melton, who was in another room, and continued searching the trailer. In the bathroom toilet, Hesketh observed two plastic baggies containing what appeared to be white powder. Melton independently observed the baggies and later smelled their contents. Both the fine grain of the powder and the pungency of its smell led Melton to believe that the baggies contained methamphetamine. Lab tests later determined that the white powder was pseudoephedrine, which when crushed is a precursor to the manufacture of

methamphetamine. The combined weight of the pseudoephedrine in the two baggies was 12.7 grams.

Hesketh's search ultimately uncovered numerous additional methamphetamine paraphernalia, all of which were admitted at trial either in their actual physical form or via photograph. These items included an unopened bottle of pseudoephedrine, digital scales, crystal iodine, five bottles of hydrogen peroxide, coffee filters, rubber tubing, propane torches, a glass pyrex dish containing what appeared to Melton to be red phosphorus residue, and an entire box of glass tubes of the type commonly used to smoke methamphetamine. A partially used bottle of crystal iodine and the digital scales were found in a trash can in the bathroom. Iodine and red phosphorous function jointly as reagents in the manufacture of methamphetamine, and digital scales are typically used to measure the reagents and the pseudoephedrine precursor to ensure a proper ratio between the two. When crystal iodine, a rare substance, is unavailable, hydrogen peroxide can be mixed with a less pure tincture of iodine to create the desired crystal form. Coffee filters assist in the manufacturing process at numerous stages. Torches, finally, heat the glass tubes that are used to smoke the methamphetamine.

### 2. *The interrogation of Bryant*

After having been read his *Miranda* rights while still at the trailer, Bryant agreed to talk with Melton, first in the presence of Whited and then alone. In the presence of Whited, Bryant admitted that he had thrown the crystal iodine and the digital scales into the trash can in the bathroom. Bryant hesitated, however, when Melton asked whether the white powder in the baggies found in the toilet was pseudoephedrine or methamphetamine. Only after consulting with and receiving permission

to answer from Whited did Bryant admit that the powder was "ephedrine," shorthand for pseudoephedrine.

Later, outside the presence of Whited, Bryant insisted that he did not own either the crystal iodine or the digital scales that he had thrown in the bathroom trash can. He nevertheless told Melton that "I'll take credit for it if it will keep everybody else out of trouble." Melton responded by saying that because their conversation was now private, Bryant "should not claim something that's not yours." Bryant replied that "what goes on here in the house is, you know, adult decisions, and between adults, and the way I look at it, we're not hurting anybody." He became "very aggravated" with Melton shortly thereafter, telling Melton that "you're not going to trick me with the friendly talk," whereupon the conversation between the two ended.

When later asked at trial to provide the context for Bryant's statements, Melton said that by "adult decisions" he understood Bryant to have been referring to the manufacture and use of methamphetamine. Bryant did not object to this testimony. Finally, in another conversation with Melton that took place sometime after the April 22, 2004 search of Whited's trailer, Bryant admitted that he had consistently used methamphetamine prior to that date in the amount of half an "eight-ball" per use, which is approximately 1.75 grams.

## II. ANALYSIS

A.    **The government's evidence at trial was sufficient to support Bryant's convictions**

1.    *Standard of review*

In arguing insufficiency of the evidence, Bryant "bears a very heavy burden." *See United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999). Evidence in a criminal case is deemed sufficient if we determine that, "after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Gardiner*, 463 F.3d 445, 456 (6th Cir. 2006) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We view the evidence in the light most favorable to the government by drawing all reasonable inferences from the testimony in its favor. *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998).

### 2. Discussion

The evidence offered against Bryant at trial was more than sufficient to support his convictions. Bryant was convicted under Count One of a conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846. In order to establish a conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt "the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy." *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990). The government need not prove the existence of a formal agreement; rather, "a tacit or material understanding among the parties is sufficient to show a conspiracy." *Id.* In addition, "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Spearman*, 186 F.3d at 746 (quotation marks omitted); *see also United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984) ("[W]e hold once and for all that our court on appeal will reverse a judgment for insufficiency of the evidence only if

this judgment is not supported by substantial and competent evidence upon the record as a whole, and that this rule applies whether the evidence is direct or wholly circumstantial."). Finally, once the government has established the existence of a conspiracy, "evidence connecting a particular defendant to the conspiracy need only be slight." *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999) (quotation marks omitted). "A buyer/seller relationship alone is not enough to establish participation in the conspiracy, but further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy." *Id.* at 421-22.

In the present case, the government offered both physical and testimonial evidence against Bryant. The physical evidence consisted of the numerous objects seized or photographed by agents Hesketh and Melton during their arrest of Bryant and his codefendants at Whited's trailer on April 22, 2004. Among these objects were the finished methamphetamine product found in an envelope on Bryant's person and the ground pseudoephedrine tablets found in the bathroom toilet.

Agent Melton's testimony provided additional corroborating evidence that (1) Bryant and his codefendants were in fact present at the home when and where Hesketh and Melton discovered the physical evidence, (2) Bryant admitted to Melton that he had thrown the ground pseudoephedrine into the toilet and a bottle of crystal iodine and a digital scale into the bathroom trash can after the agents had arrived at the trailer, (3) Bryant, when asked by Melton to identify the substance in the toilet, first looked to Whited for permission before answering Melton's question, (4) Bryant told Melton that "what goes on in the house is, you know, adult decisions, and between adults, and the way I look at it, we're not hurting anybody," and (5) Bryant refused to answer Melton when the latter asked who was manufacturing methamphetamine. Melton opined that these several statements by

Bryant, when coupled with the physical evidence observed at and retrieved from the trailer, indicated "obviously, that the manufacture of methamphetamine was occurring."

Contrary to Bryant's argument, the government offered far more than Bryant's "mere presence" as evidence that he was involved with his codefendants in a conspiracy to manufacture methamphetamine. Bryant's assertion that because "the defendant-appellant was in a trailer where items were found which would be used to make meth does not of him make a meth-maker or a conspirator" is, although an accurate statement of the law, an entirely insufficient summary of the evidence against him. At least one rational juror could have found that, based on the evidence presented, Bryant was guilty beyond a reasonable doubt of conspiring to manufacture methamphetamine. This conclusion, moreover, applies equally to the intent-based challenges that Bryant raises to his two aiding-and-abetting convictions, in defense of which Bryant offers no legal or factual argument beyond the same meritless "mere presence" claim.

**B.      The admission of Agent Melton's statements did not constitute plain error**

   ***1.      Standard of review***

Bryant further argues that the district court improperly allowed Agent Melton to "decode" for the jury certain statements that Bryant had made to Melton at the time of Bryant's arrest. First, Bryant claims that Melton engaged in total speculation when Melton opined that Bryant was referring to the manufacture of methamphetamine when Bryant said that "adult decisions" were being made in the trailer. Bryant fails to mention, however, that Melton offered this opinion specifically in response to the government's question on direct examination as to the "context" into which Bryant's statement fit. Second, Bryant claims that Melton, again without proper

"qualifications or special talents," testified that the phrase "painting a car" meant "collecting drug money." This second claim is meritless for the simple reason that, as the government notes in its brief, neither the phrase nor Melton's interpretation of it is to be found anywhere in the record.

As to the first instance of "decoding," we ordinarily review the admission of expert testimony, as well as evidentiary decisions generally, under the deferential abuse-of-discretion standard. *United States v. Bender*, 265 F.3d 464, 472 (6th Cir. 2001). Because Bryant did not object to Melton's allegedly impermissible statements at trial, however, we review Bryant's challenge to their admissibility under the even more deferential plain-error standard. *See United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004), *cert. denied*, 543 U.S. 1169 (2005). Plain error is difficult to demonstrate and exists only where, at a minimum, there is "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* at 1028. Even then, a plain-error determination remains subject to the discretion of the reviewing court, which may grant relief based upon the forfeited error, "but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* If we determine that no error exists, of course, "our inquiry is at an end." *United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993).

### 2. Discussion

This court "regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the understanding of the average layman." *Swafford*, 385 F.3d at 1030. Drug-dealing is one such activity. *See id.* (allowing the agent to testify as an expert on methamphetamine investigations); *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996)

("Courts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror."), *abrogated on other grounds by Morales v. American Honda Motor Co.*, 151 F.3d 500, 515 (6th Cir. 1998).

Agent Melton's testimony easily fits within these precedents. He was and still is a law-enforcement officer. His testimony related to characteristics of methamphetamine production and drug use generally, both types of criminal activity with which he had considerable familiarity given his training and experience as an agent of the DEA. He even testified that he once had taught a course about methamphetamine manufacturing to trainees of a Tennessee state agency. The district court, moreover, specifically explained that although Melton would be allowed to testify about those matters to which his expertise extended, such as the manufacture and production of methamphetamine, it would not certify Melton as an expert or "put my particular imprimatur on his expertness." Bryant's *Daubert*-reliability argument is accordingly misplaced. In addition, the district court issued not one, but two separate limiting instructions to the jury sua sponte, clarifying that

> [Agent Melton is] not qualified to offer an opinion about who was doing what. His opinion was the opinion that someone was making methamphetamine there, but his opinion as to who was doing it this witness cannot render that. That will have to be your opinion, your decision.

The district court later reiterated that

> [y]ou do not have to accept an expert's opinion. In deciding how much weight to give it, you consider the witness' qualifications and how he reached his conclusions. Remember that you alone decide how much of a witness' testimony to believe, and how much weight that it deserves.

–10–

Based on the record in this case, we conclude that the admission of Melton's testimony did not constitute error of any kind, much less that of the plain variety.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.