NOT RECOMMENDED FOR PUBLICATION
File Name: 10a0214n.06

No. 08-4640

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Apr 07, 2010**
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,⠀⠀⠀⠀⠀⠀**)**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀**)**
⠀⠀⠀⠀Plaintiff/Appellee,⠀⠀⠀⠀⠀**)**⠀⠀ON APPEAL FROM THE UNITED
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀**)**⠀⠀STATES DISTRICT COURT FOR THE
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀**)**⠀⠀SOUTHERN DISTRICT OF OHIO
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀**)**
PETE NECHOVSKI,⠀⠀⠀⠀⠀⠀⠀⠀⠀**)**⠀⠀OPINION
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀**)**
⠀⠀⠀⠀Defendant/Appellant.⠀⠀⠀⠀**)**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀**)**

**Before: BOGGS and GILMAN, Circuit Judges; and McCALLA, Chief District Judge.**[*]

**JON P. McCALLA, Chief District Judge**. Defendant-appellant Pete Nechovski appeals the jury verdict finding him guilty of conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846. Defendant Nechovski appeals the verdict on the basis that there was insufficient evidence for the jury to find him guilty beyond a reasonable doubt. For the reasons set forth below, the judgment of the district court is **AFFIRMED**.

**I**.

**A.⠀⠀⠀Procedural History**

On June 7, 2007, a federal grand jury for the Southern District of Ohio returned an indictment charging Defendant Pete Nechovski ("Defendant") with conspiracy to possess with intent to distribute over 500 grams of cocaine in violation of 21 U.S.C. § 846 ("Count One"). Defendant was

---

[*]The Honorable Jon Phipps McCalla, United States Chief District Judge for the Western District of Tennessee, sitting by designation.

subsequently arrested on June 27, 2007. The indictment was superseded on October 11, 2007. In addition to Count One, Defendant was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count Two") and being a felon in possession of ammunition, also in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count Three"). On January 14, 2008, Defendant filed a motion to sever Count One from Counts Two and Three for trial purposes. The district court granted Defendant's motion. A jury trial on Count One commenced on Monday, August 4, 2008. On Thursday, August 7, 2008, the jury returned a verdict of guilty.

**B.      Factual Background**

This case stems from a Drug Enforcement Administration ("DEA") investigation into the illegal distribution of narcotics in southeastern Ohio. During the course of the investigation, DEA Special Agent Matt Heufelder developed a confidential informant ("CI") who agreed to assist the DEA and the Columbus Police Department in the purchase of cocaine. (D.E. 99 at 43.) The CI told Agent Heufelder that he knew a man in Tennessee, identified only as "Brent," who knew a potential supplier of cocaine in Ohio. The potential supplier of cocaine was a tattoo artist from Columbus, Ohio named Arthur Shawn Jarrell. In February 2007, the CI arranged a meeting with Jarrell at a Waffle House restaurant on the east side of Columbus. Also present at the meeting was undercover Columbus Police Detective Charles Joyce.

Jarrell arrived to the meeting driving a gray GMC Suburban. At this meeting, Detective Joyce purchased two ounces of cocaine from Jarrell for $1,500.00. After the transaction was complete, Detective Joyce inquired into the possibility of purchasing kilogram quantities of cocaine.

Jarrell told Detective Joyce that "his partner" had access to kilogram quantities of cocaine and that he could have the cocaine available for delivery within a couple of days if needed.

In March 2007, Jarrell contacted the CI and indicated that he had kilogram quantities of cocaine for sale. During the conversation, the CI agreed to a purchase a kilogram of cocaine for $23,500.00. On March 9, 2007, the CI met Jarrell at the same Waffle House as the initial meeting to complete the transaction. Upon arrival, Jarrell notified the CI that he did not have the cocaine in his possession because he did not want to bring the cocaine without first receiving the money. Detective Joyce and another undercover police officer subsequently arrived at the Waffle House with the money. Detective Joyce, however, informed Jarrell that he would not hand over the money until he was in possession of the cocaine. At this point, Jarrell informed Detective Joyce that he was going to visit "his source" of the cocaine and ask whether the source would release the cocaine without payment in hand. Jarrell indicated that if his source was amenable to this request, the meeting would reconvene in a nearby Bob Evans restaurant parking lot.

Jarrell left the Waffle House parking lot and was followed by DEA Agent Scott Waugaman to an apartment complex located at 2526 Burgundy Lane in Columbus. Once Jarrell reached the entrance to the apartment complex, Agent Waugaman withdrew and maintained surveillance on the perimeter of the complex. Agent Waugaman radioed DEA Agent Leann Bakr and directed her to reestablish surveillance of Jarrell within the apartment complex.

By the time Agent Bakr entered the apartment complex, the gray Suburban that Jarrell was driving was parked in front of the garage door to one of the individual apartments. Agent Bakr testified that there were at least three apartments, each with a separate garage. The living area of

each apartment is located directly above the garage; therefore, access to the front door required climbing a staircase. Since Agent Bakr did not see Jarrell exiting the Suburban nor did she see which apartment Jarrell entered, she parked her vehicle in a position to see both the gray Suburban and the front door of the apartment directly above the Suburban. After approximately fifteen minutes, Agent Bakr observed an individual exit the apartment under surveillance and enter the gray Suburban. Agent Bakr was unable to identify the individual at this time. Once the gray Suburban exited the apartment complex, a separate unit picked up surveillance of the gray Suburban while Agent Bakr maintained her position within the apartment complex.

At some point after Agent Waugaman parked his vehicle outside the apartment complex, he received radio notification that a different vehicle was leaving the complex. Agent Waugaman testified that he observed a green mid-sized sedan exit the apartment complex and that he initiated a tail of the vehicle. Agent Waugaman described the individual driving the green sedan as a white male with a bald head. According to Agent Waugaman, although it was dark outside, he was able to see the individual inside the green sedan because his "headlights were shining directly inside the vehicle." After Defendant was arrested at his home on June 27, 2007, Agent Waugaman was at the scene and later testified that Defendant was the driver of the green mid-sized sedan that he observed leaving the apartment complex on the evening of March 9, 2007.

Agent Waugaman followed the vehicle for only a short period until he was called back to the apartment complex at 2526 Burgundy Lane. Prior to abandoning the tail on the green sedan, Agent Waugaman relayed the license plate number of the green sedan to other members of the surveillance team. While Agent Waugaman maintains that he relayed the license plate number accurately, the

investigation later revealed that the license plate number relayed by Agent Waugaman did not belong to a green mid-sized sedan but rather to a white Honda Civic registered to an owner in Cleveland, Ohio. Agent Waugaman testified that in his experience as a DEA agent, it is not uncommon during drug surveillance to discover that license plate numbers do not correspond to the vehicles under surveillance.

While Agents Bakr and Waugaman remained at 2526 Burgundy Lane, a separate unit of the surveillance team followed the gray Suburban as it exited the apartment complex. DEA agents followed the gray Suburban from the apartment complex to a Bob Evans restaurant parking lot where the CI was waiting in a parked vehicle. Agent Heufelder and Sergeant Steve Overholser with the Columbus Police Department were also in the Bob Evans parking lot maintaining surveillance of the CI's vehicle. At approximately 8:00 p.m., the gray Suburban arrived at the Bob Evans parking lot; Jarrell was driving the vehicle. The CI exited his vehicle and got into the passenger seat of Jarrell's gray Suburban. Within minutes, the CI placed a phone call to Agent Heufelder signaling that Jarrell was in possession of the kilogram of cocaine; the arrest team moved in and Jarrell was arrested without incident.

Shortly after he was arrested, Jarrell signed a *Miranda* waiver and began talking to the authorities. While the authorities were questioning Jarrell, his cell phone began to receive multiple phone calls from an individual listed in the cell phone's internal memory as "Pepster." Jarrell's cell phone also received several calls from a different number with the label "Pep." In fact, Agent Heufelder testified that Jarrell's cell phone received at least fourteen phone calls that evening from the numbers associated with the names "Pep" and "Pepster." Defendant's birth name is Pepi

Nechovski, and Jarrell testified that Defendant was listed in his cell phone under Defendant's nicknames "Pep" and "Pepster." Agent Heufelder and Officer Overholser testified that, based on their experience in law enforcement, they believed "Pepster" was the supplier of the cocaine because suppliers of drugs typically want their "money returned fairly quickly." In an attempt to identify "Pepster," Officer Overholser brought up a picture of Defendant on a computer screen located in one of the Columbus Police Department patrol cruisers. Officer Overholser testified that Jarrell identified the individual in the picture as the individual calling him at that time.

At one point, Agent Heufelder allowed Jarrell to answer one of the calls from "Pepster." Officer Overholser instructed Jarrell to tell the caller that "everything was fine" and that "there were no problems" in regards to the drug transaction; Jarrell complied with the officer's instructions. The conversation between Jarrell and the unknown caller was not recorded. Agent Heufelder, however, was able to hear the person on the phone and testified that the person speaking to Jarrell had a European accent. After having the occasion to listen to Defendant's voice when he was arrested on June 27, 2007, Agent Heufelder testified at trial that the voice he heard on the phone on the evening of March 9, 2007 was Defendant's voice.

The DEA and the Columbus Police Department were able to trace the phone number associated with the incoming calls from "Pepster" to a cell phone owned by a Steven Elliott Scott, Jr. Scott Jr.'s father, Steven Elliot Scott, Sr., testified that he had known Defendant since the seventh grade. Because of his father's relationship with Defendant, Scott Jr. knew Defendant well and referred to him as "Uncle Pete." At trial, Scott Jr. testified that he met Jarrell several times at Defendant's house when Jarrell performed tattoo work. Scott Jr. explained that "I always used to

go to my Uncle Pete's house and DJ on the DJ equipment." According to Scott Jr., this led Jarrell to give him the nickname "Little Pepster." He claimed that Jarrell must have saved Scott Jr.'s name in his cell phone under the label "Pepster."

In response to the Government's questioning regarding the multiple phone calls Jarrell received from Scott Jr.'s number on the evening of March 9, 2007, Scott Jr. explained that he made the multiple phone calls to Jarrell. Scott Jr. testified that all of the phone calls related to a tattoo:

Q.: Now, can you explain to me and to the jury why your phone was in such constant contact with Shawn Jarrell while he was making a drug deal?

Scott Jr.: Yes sir. I had called Shawn [Jarrell] for a tattoo, right, and he told me to call him back. So I kept trying to call him back because it was like my dad told me to call him at first for the tattoo. He told me to call him back, right. I kept calling and calling, but I didn't get no answer. . . .

Q.: The question I'm going to ask you now, did you make 15 phone calls to Arthur Jarrell between 8:18 and 10:00 p.m. right after he was arrested with a kilo of cocaine?

Scott Jr.: Right, for a tattoo I kept calling him because, I mean, was trying to get this finished. That's what I really wanted.

Q.: Okay. That was the most important thing in your life that night, so you called 15 times to get it done?

Scott Jr.: Well, he told me to call him back, so I kept calling him back.

Scott Jr. denied having any knowledge of the drug deal and denied ever giving his phone to Defendant.

In addition to the phone calls made to Jarrell's cell phone on March 9, 2007, phone records revealed that someone from the number subscribed to Scott Jr. called Jarrell on March 7, 2007 shortly after the CI met with Jarrell. These same records also revealed that Jarrell called this number on March 8, 2007 shortly after Jarrell spoke with the CI. At one point, Scott Jr. testified that he made these phone calls to Jarrell in reference to the tattoo. Later at trial, Scott Jr. testified that he could not explain the phone calls made on March 7 and 8, 2007, possibly because he let his father use his phone during this period of time.

On the evening on March 9, 2007, approximately forty minutes after the Suburban exited the Burgundy Lane complex, Agent Bakr observed another individual leave the apartment under surveillance. Authorities later identified this man as Jimmy Hampton, the tenant and primary resident of that apartment. Upon leaving the apartment, Hampton was immediately detained and interviewed by the authorities. Hampton told authorities that he had been friends with Defendant for approximately six years. Specifically, Hampton testified that he met Defendant through their mutual interest in disc jockeying and that he talks with Defendant "probably 20 times a day." Hampton denied knowing an individual named Shawn Jarrell and in response to being shown a picture of Jarrell, Hampton stated "I've never seen that guy in my life." After being questioned about the events that occurred on the evening of March 9, 2007, Hampton told authorities that to his knowledge, neither Defendant nor Jarrell had been in his apartment that evening and that no drug

transaction occurred at his apartment. In addition, Hampton consented to a search of his apartment; no drugs or drug paraphernalia were found.

The kilogram of cocaine seized from Jarrell when he was arrested was submitted to the Columbus Police Department laboratory for testing. Detective Mark Green with the Columbus Police Department crime scene search unit discovered a single latent fingerprint from the adhesive side of a piece of masking tape on the cocaine packaging. A lift of the fingerprint was transferred to Officer Robert Lawson, a supervisor in the latent fingerprint section at the Columbus Police Department. After studying the known prints of Defendant, Officer Lawson testified at trial, in response to a question asking for "scientific certainty," that the fingerprint on the masking tape belonged to the Defendant. Officer Lawson also testified that if an individual touched the sticky side of a piece of tape and the piece of tape was then placed back on the roll, when the tape was pulled off again, this process could destroy part or all of a fingerprint. Officer Lawson admitted that this was based purely on his expert opinion and was not based on any research that he had performed.

Michael Sweedo, an expert in the field of fingerprint identification, testified as a defense witness at trial. Sweedo confirmed Officer Lawson's testimony that the latent print from the masking tape and the known prints of Defendant were made by the same individual. Sweedo, however, also described an experiment that he had conducted with various kinds of adhesive tape. Sweedo testified that he was able to obtain latent fingerprints up to a year after they had been deposited on the adhesive side of various kinds of tape. Sweedo admitted that his experiment was performed in a controlled environment and that it may not "totally reflect real life scenarios." Sweedo also admitted that he had not used masking tape in his experiment, which was the type of

tape on which Defendant's latent print was found. On cross-examination, Sweedo was asked whether a fingerprint that was deposited on the adhesive side of a piece of tape would be distorted if that piece was "put back on to the roll . . . ." Sweedo responded that in his expert opinion, it would not "distort it sufficiently to be able to not effect an identification. Either the print is identifiable or it's not identifiable."

At Defendant's trial, Jarrell was the second witness called by the Government. Jarrell stated that he had known Defendant for multiple years and that he considered Defendant a good friend. During his testimony, Jarrell stated that he had two numbers for Defendant saved on his phone and that they were listed under the labels "Pep" and "Pepster." Jarrell denied ever buying drugs from or selling drugs to Defendant. When questioned on the source of cocaine that he sold in the two instant drug transactions, Jarrell testified that he obtained the cocaine "[f]rom a guy I'd met at a bar out on the east side." Immediately after making this statement, however, Jarrell testified "I'm sorry . . . I've been lying to you the whole time. I was scared to death, and I didn't know what to do, and I can't sit here in a court of law and lie." At that point, direct examination of Jarrell ceased and the jury was excused. Jarrell was not recalled as a witness. After Jarrell was excused as a witness, the Government presented the following additional witnesses in order: Detective Green, Hampton, Agent Waugaman, Agent Bakr, Sergeant Overholser, Scott, Sr., Scott, Jr., Officer Lawson, and Agent Heufelder. The last witness to testify at trial was Michael Sweedo, Defendant's expert witness.

On August 7, 2008, the jury found Defendant guilty on Count One of the superseding indictment: conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. §

846. On November 25, 2008, Defendant was sentenced to 120 months in prison, the mandatory

minimum sentence. This timely appeal followed.

## II.

### A.       Standard of Review

When reviewing the sufficiency of the evidence to support a criminal conviction, the

"relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Accordingly, in addressing a

challenge to the sufficiency of the evidence at trial, this court does not weigh the evidence presented,

consider the credibility of witnesses, or substitute the court's own judgment for that of the jury.

*United States v. Abdullah*, 162 F.3d 897, 902 (6th Cir. 1998). "Circumstantial evidence alone is

sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis

except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (citation omitted).

Ultimately, "[a] defendant making such a challenge bears a very heavy burden." *Id.*; *see also United*

*States v. Jones*, 285 F. App'x 243, 244 (6th Cir. 2008) (noting that a defendant faces "an onerous

standard of review" with respect to a sufficiency-of-the-evidence challenge).

### B.       Sufficiency-of-the-Evidence Analysis

The sole issue on appeal is whether the government presented sufficient evidence at trial to

sustain Defendant's conviction. "To sustain a conviction for drug conspiracy under [21 U.S.C. §

846], the government must prove beyond a reasonable doubt: (1) an agreement to violate the drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007). "These elements may be shown by either direct or circumstantial evidence." *Id.*; *see also United States v. Crayton*, 357 F.3d 560, 573 (6th Cir. 2004) ("Circumstantial evidence may be the 'sole support' of a conviction under § 846." (citation omitted)). Proof of an express or formal agreement is not required; "[a] tacit or mutual understanding among the parties is sufficient." *United States v. Forrest*, 17 F.3d 916, 918 (6th Cir. 1994). While "mere association with conspirators is not enough," *United States v. Hughes*, 505 F.3d 578, 588 (6th Cir. 2007), "once the existence [of] a conspiracy is shown [beyond a reasonable doubt], the evidence linking an individual to that conspiracy need only be slight," *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006); *see also United States v. Betancourt*, 838 F.2d 186, 174 (6th Cir. 1988).

Defendant does not dispute that there was ample evidence from which the jury could conclude beyond a reasonable doubt that two drug offenses occurred during the time period of the alleged conspiracy. Likewise, Defendant does not dispute that the evidence presented by the Government at trial was sufficient to show that a conspiracy existed between Jarrell and the man from Tennessee identified only as "Brent." Defendant contends, rather, that insufficient evidence was presented at trial to allow a reasonable juror to find that Defendant joined in the conspiracy.

In support of this contention, Defendant relies on *United States v. Saunders*, 325 F.2d 840 (6th Cir. 1964). In *Saunders,* the convictions of the defendant for possession and sale of narcotics were reversed on the ground that the evidence was insufficient. *Id.* at 844. The panel in *Saunders*

stated: "Evidence that at most establishes no more than a choice of reasonable probabilities cannot be said to be sufficiently substantial to sustain a criminal conviction on appeal." *Id.* at 843. In the instant case, Defendant argues that reversal is warranted because, based on the evidence presented at trial, the theory that Defendant is innocent is equally as probable as the theory of guilt.

In *Saunders*, it was found that there was insufficient evidence to support a conviction because:

> The record [was] completely devoid of any direct testimony that [the defendant] ever possessed any narcotics or that she ever sold any narcotics . . . nor would the circumstantial evidence against her present anything more than a choice of probabilities. None of the identified currency was traced to her. No passage of anything between [the defendant] and [her coconspirator] was ever observed. No finger print testimony was presented that might link her with the envelope containing the heroin.

*Id.* Defendant's reliance on *Saunders*, however, is misplaced. *Saunders* is factually distinguishable from the case at bar, and the mere fact that Defendant is able to offer the alternative theory of innocence does not automatically render the evidence insufficient. *See United States v. Degan*, 229 F.3d 553, 556 (6th Cir. 2000) ("In considering the inferences that a jury may draw from the evidence, [this Court] need not exclude every logical hypothesis other than guilt." (citing *United States v. Johnson*, 741 F.2d 854, 856 (6th Cir. 1984)).

In the instant case, the Government presented ample evidence in the form of witness identification testimony for a jury to infer Defendant's knowing participation in the drug conspiracy: (1) DEA Agent Waugaman identified Defendant as the man he saw leaving the apartment complex located at 2526 Burgundy Lane on the evening of March 9, 2007; (2) DEA Agent Heufelder

overheard the conversation between Jarrell and "Pepster" on the evening of March 9, 2007 and later identified "Pepster's" voice to be that of the Defendant; and (3) Officer Overholser testified that upon Jarrell's arrest, Jarrell identified Defendant's picture as being the person who had just called him under the name of "Pepster." Viewing this evidence in the light most favorable to the prosecution, it was not irrational for the jury to conclude that Defendant played at least some role in the conspiracy.

Evidence relating to the cell phone number used to call Jarrell on the evening of March 9, 2007 further supports the jury's conclusion that Defendant was involved in the conspiracy. Jarrell testified that two numbers were saved in his cell phone that were associated with Defendant: one saved under the label "Pep" and the other saved under the label "Pepster." Agent Heufelder and Officer Overholser testified that Jarrell's cell phone received approximately fourteen phone calls on the evening of March 9, 2007 from the numbers saved as "Pep" and "Pepster." In addition, Defendant was in possession of multiple cell phones at the time of his arrest, one of which was registered to a third person.

Defendant maintains that these calls were not made by him, but rather were made by Steve Scott, Jr. in reference to a tattoo appointment. Agent Heufelder testified that he overheard one conversation between Jarrell and the unidentified caller and that the substance of the telephone call related to a drug transaction. Despite the fact that Scott Jr. testified that he made all fourteen phone calls to Jarrell on the evening of March 9, 2007, he was unable to explain how his phone was used to make the call regarding the drug transaction or the calls made to Jarrell on March 7th and 8th.

Defendant also maintains that the evidence presented by the Government does not suffice because Jarrell identified an unknown "guy [he] met at a bar from the east side" as his cocaine supplier. Thus, Defendant argues that Jarrell's testimony precludes a finding that there is sufficient evidence to connect Defendant to the conspiracy. Although it is undisputed that Jarrell identified an unknown "guy from the east side" as his supplier, Jarrell also admitted in open court that he had been lying "the whole time."

Essentially, Defendant argues that the jury should have believed the testimony of Steve Scott Jr. and Arthur Shawn Jarrell. Defendant's argument relates to witness credibility, and at this stage of review, "all credibility issues are to be resolved in favor of the jury's verdict." *United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008). Although it was possible for the jury to believe that Scott Jr. made all fourteen phone calls in reference to a tattoo or that Jarrell's supplier was actually "some guy [he] met at a bar from the east side," it was nonetheless logical for the jury to conclude, based on the evidence provided by the Government, that Defendant not only made the phone calls to Jarrell but that Defendant was Jarrell's supplier. Because the evidence was sufficient for a rational juror to find guilt beyond a reasonable doubt, this Court will not substitute its own conclusion for that of the jury. *See Abdullah*, 162 F.3d at 902.

Moreover, unlike the conviction we reversed in *Saunders*, the jury's conclusion that Defendant was a member of the conspiracy is corroborated by fingerprint evidence. Defendant concedes that his fingerprint was discovered on the adhesive side of a piece of masking tape affixed to the package of cocaine. Defendant argues, however, that the fingerprint was deposited on the piece of tape at some time prior to March 9, 2007, most likely when Defendant was boxing up his

"D.J." mix tapes, and that Jarrell used the same roll of tape at a later time to package the kilogram of cocaine. In support of this argument, Defendant relies on the testimony of expert witness Michael Sweedo. Sweedo testified that in his controlled experiment, fingerprints could last up to one year and still be of value for identification purposes. Accordingly, Defendant asserts that the fingerprint evidence was "too attenuated" to prove beyond a reasonable doubt that Defendant was a member of the drug conspiracy.

The jury reasonably could have concluded that the fingerprint was deposited on the tape when Defendant was packaging the cocaine. This is consistent with Officer Lawson's testimony that a fingerprint would likely lose its evidentiary value in the event that it was rolled back onto the roll of tape. Regardless of the alternative theories proposed by Defendant, "the critical point is that the jury could have drawn different inferences from this evidence, and our mandate is to affirm when the jury's choice was a rational one–which it was here." *See United States v. Arnold*, 486 F.3d 177, 182 (6th Cir. 2007).

## III.

For all of the reasons set forth above, the judgment of the District Court is **AFFIRMED**.